ESTATE OF WILLIAM F. STAHL, DECEASED, MARION B. STAHL, EXECUTRIX, AND MARION B. STAHL, INDIVIDUALLY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1462–67. Filed June 30, 1969.

*J. Roy Browning* and *Joseph M. Solon*, for the petitioners.
*Nelson E. Shafer*, for the respondent.

594

596

OPINION

The issue for decision is primarily a question of law. Petitioners contend that the amounts received by petitioner during the years in question should be treated as long-term capital gain taxable in the respective years of receipt, whereas respondent contends that such amounts should be treated in those years as ordinary income. As will appear later, we resolve the issue partly for petitioners and partly for respondent.

The principal thrust of the petitioners' argument lies in their contention that the payments received by petitioner during the taxable years in question from Precision as partial payment on certain notes, which notes represented the purchase price paid by Precision in 1956 for eight patents and five patent applications, constitute a partial "retirement" of such notes.[1] Consequently, petitioners argue in their brief, since the notes qualified as capital assets in their hands, they are entitled to the benefits of the special provisions of section 1232 of the Internal Revenue Code of 1954 [2] which treats said amounts as received in exchange for the notes thus entitling the proceeds to capital gains treatment.

At the outset we can quickly dispose of this main thrust of the petitioner as we have no difficulty in holding that section 1232 has no ap-

---

[1] It may be noted from our findings that in the respective taxable years petitioner reported the amounts received as long-term capital gain from the sale of "patents" and not as amounts received from the retirement of notes.

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, *notes*, or certificates or other evidences of indebtedness, which are *capital assets* in the hands of the taxpayer, and which are *issued by any corporation*, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder *on retirement* of such bonds or other evidences of indebtedness shall be considered as amounts received in *exchange* therefor * * * [Emphasis supplied.]

598

plication to the facts before us. Section 117(f) of the Internal Revenue Code of 1939, the predecessor to section 1232, was limited in its scope to awarding capital gain treatment to the proceeds from the retirement of bonds or other evidences of indebtedness which were issued in registered form or with coupons attached. On the occasion of reenacting section 117(f) into the 1954 Code as section 1232, amendments were made and the reach of the provision lengthened. However, a review of the legislative history of such amendments fails to reveal any intent on the part of Congress to include within the expanded scope payments made in satisfaction of notes issued as evidence of an obligation to pay a prescribed purchase price.[3] Such notes obviously have no independent significance other than as evidence of an agreed purchase price for property sold. To accept petitioner's theory would mean that, through the simple expedient of accepting notes in lieu of cash, a taxpayer could always insure the receipt of capital gain from the sale of property.[4] Cf. *Pinellas Ice Co.* v. *Commissioner*, 287 U.S. 462 (1933). Surely Congress never intended such a bizarre result.

Furthermore, it is not inconsistent with the above holding to agree with respondent that the receipt of notes in 1956 did not, under the circumstances then existing, require the reporting of any income.[5] Payment on the notes was in reality dependent upon the success of the licensee of the patent in using the patents and this success, in turn, depended upon the vagaries of the business involved. In the language of the Supreme Court in *Burnet* v. *Logan*, 283 U.S. 404, 413 (1931), "the promise of future money payments [was] wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." The Supreme Court went on to hold, as we now hold with respect to the notes here involved, that no fair market value could have been assigned to the promise to pay at the time of its receipt. Indeed in the case before us no payments were in fact made on the notes for almost 3 years following their issuance and it was almost 7 years before the payments became current. Hence no gain or loss could have been computed in the year of receipt and hence the transaction could not have been deemed closed. *Stephen H. Dorsey*, 49 T.C. 606 (1968) ; *Susan J.*

[3] Hearings before House Committee on Ways and Means on General Revision of the Internal Revenue Code, 83d Cong., 1st Sess., Part 2, p. 1080 (1953). Hearings before Senate Committee on Finance on H.R. 8300, 83d Cong., 2d Sess., Part 1, p. 67 (1954). S. Rept. No. 1622 to accompany H.R. 8300, 83d Cong., 2d Sess., p. 433 (1954). See also *Rosen* v. *United States*, 288 F. 2d 658, 662 (C.A. 3, 1961).

[4] Petitioners' contention that the notes qualified as capital assets in petitioner's hands because received in exchange for capital assets (as they characterize the patents and patent applications) is fallacious on its face. The status of property as a capital asset or non-capital asset usually turns on the occupation of the owner. It certainly does not turn on the nature of the consideration paid for the property. Quite obviously petitioners cite no authority for their novel theory.

[5] It is noted that petitioner itself did not report any income in 1956 from the sale at issue.

*Carter*, 9 T.C. 364 (1947) ; *Ayrton Metal Co.* v. *Commissioner*, 299 F. 2d 741 (C.A. 2, 1962).

It is our opinion that the plain substance of the transaction was a sale of the patents and patent applications in 1956 for $300,000 to be paid in *installments* of $20,000 per year for 15 years beginning on January 3, 1957, and, as provided in paragraph 4 of the January 3, 1956 agreement of sale, the 15 promissory notes were given as evidence of the "full purchase price for said inventions." It follows then that we conclude that the payments in issue merely represent amounts paid toward the liquidation of the installment obligation to pay a prescribed purchase price.

Having made our determination with respect to the nature of the payments, we are still left with the question of whether the payments should be classified as the receipt of capital gain or ordinary income. Interestingly enough both parties agreed in their brief that the eight patents qualified as "capital assets" in the hands of the petitioner, and hence, as will be evident later, we need not decide the validity of the agreement.

Preliminarily to making our decision with respect to this question, it is appropriate to note that this Court has recently held that patents qualify as depreciable property. *George N. Soffron*, 35 T.C. 787, 790–791; and *United States Mineral Products Co.*, 52 T.C. 177 (1969). We so hold again. In the *United States Mineral Products Co.* case, it was said:

A patent is intangible property whose value is protected by a Government-imposed monopoly for a period of time over which its development costs are normally depreciable. Section 1.167(a)–3, Income Tax Regs. Because it constitutes depreciable property when used in the operation of a business, it does not qualify as a capital asset under section 1221, but, if held for more than 6 months, its sale or exchange may result in capital gain under section 1231. * * *

Given this depreciable character of patents, it follows that we agree with respondent to the extent that he contends that section 1239 of the Code applies to the sales proceeds received for the patents.[6] That section provides that any gain, received by an individual upon the sale

[6] SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.
(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

* * * * * * *

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren ;
any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.
(b) SECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.— This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.

of "property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation" and such transferee is a controlled corporation, shall be treated, in effect, as ordinary income. Since at all times the petitioner owned in excess of 99 percent of the stock of the purchaser-transferee, Precision, he clearly met the 80-percent ownership requirement for determining control contained in paragraph (a)(2). Furthermore there is no question that the patents were depreciable property in the hands of Precision. See sec. 1.167(a)–3 and (a)–6, Income Tax Regs.; and *United States Mineral Products Co., supra.* It follows, therefore, that any gain from such sale is to be treated as "ordinary income" under section 1239(a). Since the selling price of the patents was $140,000, we hold consequently that 140/300 or 46⅔ percent of the amounts received by petitioner in 1961, 1962, and 1963 is taxable as ordinary income. Sec. 1239(a).

Respondent contends that the same decision should be made with respect to the proceeds from the sale of the five patent applications. With this contention we do not agree. The sale of the patent applications was not a sale of depreciable property. *Hershey Manufacturing Co.,* 14 B.T.A. 867, affd. 43 F. 2d 298 (C.A. 10, 1930) ; *United States Mineral Products Co., supra.* In the latter case we also said:

A patent application is an assignable property right (*Saunders* v. *Commissioner,* 29 F. 2d 834 (C.A. 3, 1928)), but not a depreciable asset. When the patent is issued depreciation may be taken over its life. *Hershey Manufacturing Co.,* 14 B.T.A. 867 (1928), affd. 43 F. 2d 298 (C.A. 10, 1930). We hold that the application constituted a capital asset which was sold. See *Samuel E. Diescher,* 36 B.T.A. 732 (1937), affd. 110 F. 2d 90 (C.A. 3, 1940), certiorari denied 310 U.S. 650 (1940).

Nor was the sale of the patent applications a sale of property "of a character" which is subject to the allowance for depreciation within the purview of section 1239(b). Patent applications by their very nature are not assets which are subject to being "redepreciated" and hence are not within the intendment of Congress.[7] We find that section 1239 has no applicability to the proceeds from the sale of said applications.

We view the patent applications as capital assets as that term is defined in section 1221, *United States Mineral Products Co., supra,* and hold that under section 1223(3)[8] the gain from the sale should therefore be treated as long-term capital gain. Since the selling price of the patent applications was $160,000, we hold further that 160/300

---

[7] See H. Rept. No. 586, 82d Cong., 1st Sess., p. 26 ; S. Rept. No. 781, 82d Cong., 1st Sess., p. 69 ; Conf. Rept., H. Rept. No. 1213, 82d Cong., 1st Sess., p. 79.

[8] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.

(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

or 53⅓ percent of the amounts received by petitioner in 1961, 1962, and 1963 is taxable as long-term capital gain. Secs. 1221 and 1222(3).

In their briefs the parties have touched upon such points as recasting the taxable effect of the transaction to the year 1956; the possible appplication of part II of subchapter Q of chapter 1 of subtitle A, embracing sections 1311 through 1315; and whether respondent is now estopped to make the adjustments that are involved herein. In view of what we have previously said herein we do not deem it necessary to discuss these points further, other than to say on the matter of any claim of estoppel, which presumably, if made, would be based upon the various audits of petitioners' returns, that such claim would be unfounded.

The deficiencies should be recomputed in accordance with this opinion.

*Decision will be entered under Rule 50.*