## CLEMENT O. DENNIS AND GENIA LEE DENNIS, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 772–70.    Filed December 13, 1971.

*Louis Regenstein, Jr., Charles M. Cork,* and *William A. Burnham,* for the petitioners.

*James D. Burroughs,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income taxes for the calendar years 1955 through 1962 in the following amounts:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1955 | $37, 436. 32 | 1959 | $21, 163. 87 |
| 1956 | 22, 175. 34 | 1960 | 21, 305. 38 |
| 1957 | 39, 158. 53 | 1961 | 2, 677. 28 |
| 1958 | 26, 855. 66 | 1962 | 301. 60 |

Petitioners in their petition claimed overpayments for each of the years 1955 through 1960 based on an alternative position which they appear to have abandoned.

The only issue for decision is whether the amounts received in the years here in issue by petitioners as payments on an unregistered promissory note which did not have interest coupons attached issued on October 1, 1953, to one of petitioners by a corporation on its organization in exchange for all his rights to an undivided interest in patents and patent applications are taxable as ordinary income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, resided at Macon, Ga., at the time of the filing of the petition in this case. They filed their joint Federal income tax returns for the calendar years 1955 through 1962 with the district director of internal revenue at Atlanta, Ga.

In 1939, Clement O. Dennis, hereinafter referred to as petitioner, formed a partnership with A. L. Jarvis and entered the tire-recapping business in Macon, Ga. The partnership was primarily in the business of recapping tires under a Government contract, but later it expanded

to include operation of a service station. This venture, known as the Dennis-Jarvis Tire Co. operated until 1944.

The tire-recapping equipment of the Dennis-Jarvis Tire Co. was steam operated, molding the tires by applying heat in the recapping process. In 1943 petitioner became acquainted with a retired engineer, J. W. Napier, who had, several years earlier, invented two electric tire-recapping devices. Napier had filed for letters patent for his inventions in 1942, the serial numbers being 427,423 and 463,726. Napier's inventions lacked certain features which would affect their usefulness; nevertheless, petitioner was convinced that, if improved, an electrically operated recapping mold would work.

Napier and petitioner in April 1943 discussed the granting by Napier to petitioner of exclusive rights and license to manufacture, use, and sell electric recapping molds of the design specified in the aforementioned patent applications. The sole territorial exclusion of this license was to be a 10-State area in the South which had previously been licensed to the MacMillan Electric Mold & Rubber Co. An agreement to this effect stated to be entered into on April 15, 1943, was reduced to writing but was signed only by Napier.

On January 31, 1944, by written contract, petitioner was given an exclusive right for a period of 90 days thereafter to an assignment of any of Napier's rights in the electric mold inventions, serial numbers 427,423 and 463,726. Petitioner agreed that if he obtained the assignment he would, with reasonable promptness, begin manufacturing the recapping equipment and pay 15 percent of the net profits to Napier.

Within the specified 90 days, petitioner advised Napier that he would enter the business of manufacturing tire-recapping apparatus. Petitioner and A. L. Jarvis formed another partnership in May 1944 known as the Den-Nap Electric Mold Co. and began the manufacture of molds for the recapping of automobile tires. Petitioner and Jarvis were equal partners in this venture. On May 1, 1944, petitioner and Jarvis contracted to purchase some land to build a plant and subsequently acquired the land on August 16, 1944. Prior to acquiring title to the land, construction of the plant was begun.

Napier, at the suggestion of petitioner, had been working all during this time at refining and improving his electric molds. On May 12, 1944, petitioner and Napier called on a firm of patent attorneys in Washington, D.C., to discuss the filing of further patent applications. On September 6, 1944, Napier made formal application for a patent for his separate section abutment ring mold component for tire-recapping apparatus bearing serial number 532,909. The patent application had previously been assigned by Napier to petitioner by written assignment dated August 29, 1944. Letters Patent No. 2,398,151 were

issued on April 9, 1946, for this device, in the name of petitioner as assignee of Napier.

On April 15, 1945, Napier made formal application for a patent for a tire-recapping apparatus, bearing serial number 586,684. The patent application had previously been assigned by Napier to petitioner on March 27, 1945. On December 5, 1946, a continuation application for patent bearing serial number 789,989 for the same invention in substitution for application serial number 586,684 was filed. Letters Patent No. 2,475,579 were issued on this application on July 5, 1949, in the name of petitioner as assignee of Napier.

Den-Nap Electric Mold Co. entered into a written agreement with Napier on August 11, 1944, whereby Napier agreed to provide certain engineering advisory services to the partnership for a salary plus 20 percent of the net profits of the partnership. Den-Nap proposed to manufacture and sell or lease electric recapping molds in accordance with patterns prepared and to be prepared by Napier, within 60 days after August 11, 1944. In the event of Napier's death or incapacity, his salary would cease but the percentage of profits would be increased to 25 percent and would be paid to Napier, his heirs and assigns, so long as the Den-Nap partnership or his successors, continued in business and used the molds designed by Napier. Napier also assigned to Den-Nap Electric Mold Co. by the same instrument, all of his existing inventions and applications for patents relative to the manufacture and use of electric molds in the recapping of tires subject to existing assignments.

Napier died in 1949 and in 1951 a settlement on the employment agreement was effected with his widow by petitioner. She released all claims she might have to U.S. Letters Patent Nos. 2,398,151 and 2,475,579 and any rights arising under the agreement between Den-Nap Electric Mold Co. and her late husband in exchange for the sum of $10,000.

Den-Nap, the partnership, began the manufacture of tire-recapping equipment in the summer of 1944, prior to the closing of the purchase of the plant site. Although a model of the tire-recapping apparatus incorporating Napier's earlier inventions (bearing serial numbers 427,423 and 463,726) had been shown to petitioner by Napier in 1943 when they first became acquainted, the first model of the improved electric mold recapping apparatus was not built and tested by the Den-Nap partnership until the early or middle part of July 1944. Petitioner, believing himself to be especially knowledgeable about tire recapping, had proceeded to form the Den-Nap partnership to manufacture these new improved molds on the basis of the drawings show to him by Napier.

For several months prior to September 1944, substantial studies were conducted and detailed calculations were made to determine a proper selling price for the recapping apparatus. The first sale or lease by the partnership, Den-Nap, of the tire-recapping apparatus embodying and employing the new Napier inventions, the separate section abutment ring mold component or the tire-recapping apparatus was to J. J. Thompson on September 5, 1944. The first mold was completed approximately 2 months prior to the lease date September 5, 1944. Subsequent to the lease date of September 5, 1944, additional molds were leased during 1944.

On January 1, 1946, the partnership of Den-Nap Electric Mold Co. was incorporated under the same name pursuant to the laws of the State of Georgia. A total of 500 shares of $100 par value stock was authorized and 100 shares were issued. Dennis and Jarvis exchanged the assets of the partnership for 50 shares each of the corporation's stock. The corporation Den-Nap Electric Mold Co. (hereinafter referred to as Den-Nap) assumed all the debts and liabilities of the partnership and received all the partnership's assets. Den-Nap continued to manufacture and lease or sell electric molds used in the recapping of automobile, truck, and airplane tires. The molds incorporated Napier's abutment ring mold component and tire-recapping apparatus.

In late 1948 and early 1949, Jarvis sold his stock in Den-Nap to Zeb Mattox who, at that time, was the sole owner of Retreading Equipment Co. of Charlotte, N.C., hereinafter referred to as Retreading.

Two more issues of five shares each of the stock of Den-Nap were made by the corporation. These shares were issued to James Emerson (five shares) and C. F. Calhoun (five shares). The stock of C. F. Calhoun was later reacquired by the corporation as treasury stock, so that ownership of Den-Nap became as follows:

| Stockholder | Number of shares |
| --- | --- |
| C. O. Dennis | 50 |
| Zeb Mattox | 50 |
| James Emerson | 5 |
| Treasury stock | 5 |

At the time Jarvis sold his Den-Nap stock to Mattox, the latter agreed to transfer $15,000 into the corporation. In exchange for the cash, petitioner agreed to assign to Zeb Mattox, a one-half interest in Letters Patent No. 2,398,151 and in the patent application which resulted in Letters Patent No. 2,475,579, the Napier tire-recapping apparatus and the Napier separate section abutment ring mold component.

Zeb Mattox owned and operated Retreading as a proprietorship until January 1, 1952, when he took his four sons in as equal partners. Retreading manufactured stands on which recapping molds rest. It

also manufactured buffers for taking old rubber off the tires and other products related to the recapping industry such as hoists and spreader wheels.

Retreading used two patents developed in connection with the mold stand that it manufactured. The patent application for the first of these, a tire-retreading apparatus, was filed on October 11, 1952, in the names of Harris Potter, Zeb Mattox, and Ormand Mattox. Letters Patent No. 2,723,425 were issued on November 15, 1955, covering this application.

On October 10, 1952, Harris Potter, Zeb Mattox, and Ormand Mattox assigned to Zeb Mattox and petitioner each a one-half undivided interest in the patent application for the tire-retreading apparatus which later resulted in the issuance of Letters Patent No. 2,712,156.

On January 3, 1953, Zeb Mattox and Ormand Mattox assigned to Zeb Mattox and petitioner each a one-half undivided interest in the patent applications for the bead-spreading device, which later resulted in the issuance of Letters Patent No. 2,723,425.

On July 29, 1952, Zeb Mattox assigned to petitioner a one-half undivided interest in Letters Patent No. 2,267,243, which patent had been issued to Donald MacMillan on December 23, 1941. The Mac-Millan patent, a retreading mold, was acquired by Zeb Mattox in 1952 for $1,000 to protect against a possible claim against the Napier patents. Den-Nap issued a check for $1,000 dated June 28, 1952, to Zeb Mattox for him to obtain this patent.

Subsequent to his purchase of Den-Nap stock, Mattox made business purchases from Den-Nap. Den-Nap encountered difficulty in obtaining payment from Mattox for shipments and in collecting the $15,000 which he agreed to place in the company when he purchased the stock from Jarvis. The debt of $15,000 was settled on the basis of some equipment that Mattox transferred to Den-Nap and, as a result, the actual cash was never collected.

On May 13, 1953, petitioner assigned to Mattox a one-half undivided interest in the Napier inventions and Letters Patent Nos. 2,398,151 and 2,475,579 pursuant to his previous agreement made at the time Mattox purchased his stock in Den-Nap from Jarvis.

During the portion of the year 1953 prior to October, petitioner and Zeb Mattox, along with attorneys and accountants counseling each and other interested persons, discussed the fact that royalties should be paid to petitioner and Mattox on the patents. As a result of these discussions it was decided to form a corporation and assign the patents to a new corporation which would license Den-Nap and Retreading to manufacture equipment under the patents with the new corporation being their sales agency.

Further discussions were held to determine a reasonable royalty rate to be paid for use and manufacture under these patents and to

determine a reasonable and fair price to be placed on the patents and patent applications which petitioner and Mattox proposed to transfer and assign to the new corporation. As a result of those conferences, a value of $3 million was placed on the patents and patent applications to be transferred by petitioner and Zeb Mattox to the new corporation.

On October 1, 1953, Precision Recapping Equipment Co., hereinafter referred to as Precision, was formed under the laws of the State of Georgia with an initial capital of $10,000 in cash paid. Capital stock was authorized and issued as follows:

| Stockholder | Amount paid | Number of shares acquired |
|---|---|---|
| Zeb Mattox | $4,000 | 40 |
| C. O. Dennis (petitioner) | 4,000 | 40 |
| Charles Cork | 1,000 | 10 |
| E. W. Probst | 1,000 | 10 |

Probst invested in the corporation at the suggestion of Zeb Mattox and stock was issued to Cork at the invitation of petitioner. Petitioner served as president of the corporation and Zeb Mattox served as vice president.

On the same date that Precision was formed, petitioner and Zeb Mattox assigned to this corporation the two Napier patents in which each petitioner and Zeb Mattox then had a one-half interest, Letters Patent Nos. 2,398,151 and 2,475,579. Assigned also to Precision were: (1) The applications for letters patent for the retreading apparatus and the bead-spreading device, in which an undivided one-half interest each had been assigned to Zeb Mattox and petitioner; (2) the MacMillan patent, a retreading mold, which had been acquired by Zeb Mattox in 1952 with funds supplied by Den-Nap; and (3) the applications for two design patents, which were never granted, which had been acquired by petitioner and Zeb Mattox more than 6 months prior to October 1, 1953.

The assignment of October 1, 1953, stated consideration for each of the assigned patents or patent applications to be as follows:

| | |
|---|---|
| Letters Patent No. 2,267,243 issued to MacMillan Electric Mold & Rubber Co.—retreading model | $10,000 |
| Letters Patent No. 2,475,579, the Napier tire-recapping apparatus | 2,950,000 |
| Letters Patent No. 2,398,151, the Napier separate section abutment ring mold component | 5,000 |
| Application for Letters Patent, serial No. 314,366, the Potter tire-retreading apparatus | 20,000 |
| Application for Letters Patent, serial Nos. D–24178 and D–24179, the two design patents acquired by Zeb Mattox and petitioner 6 months prior to Oct. 1, 1953 | 10,000 |
| Application for Letters Patent, serial No. 330,089, the Mattox bead-spreading device | 5,000 |
| Total | 3,000,000 |

The patent for the Napier tire-recapping apparatus was the basic patent for the manufacture of the retreading equipment. It was the opinion of petitioner, patent counsel, and other involved persons that the Potter tire retreading apparatus and the Mattox bead-spreading device were merely improvements on what the Napier tire-recapping apparatus could already perform. The MacMillan patent had only a short time to run and was acquired merely to protect against possible claims against the Napier patents.

In connection with the acquisition by Precision of the entire interest of Zeb Mattox and petitioner in the assigned patents and applications for patents, Precision gave petitioner and Mattox each a promissory note in the face amount of $1,500,000 dated October 1, 1953. The terms of the notes were identical. Each provided for 150 monthly installments of $10,000 each with interest at 2½ percent per annum. The notes were not issued with interest coupons or in registered form.[1]

After the assignment of the patents to Precision, that corporation licensed Den-Nap and Retreading to manufacture under the patents. Precision granted to Den-Nap a nonexclusive and nonassignable right to manufacture and sell throughout the United States of America and its territorial possessions tire-recapping apparatus and equipment embodying and employing the inventions which were assigned to Precision by petitioner and Zeb Mattox on the same date. Den-Nap and Retreading each agreed to pay Precision a license fee or royalty computed at the rate of 20 percent of its net sales of all such tire-recapping apparatus and equipment.

The license agreement with Retreading varied slightly from that with Den-Nap. Retreading was given no rights to manufacture and sell under patent No. 2,398,151, the Napier separate section abutment

---

[1] Petitioner's note was as follows:

PROMISSORY NOTE

$1,500,000.00     Macon, Georgia, October 1, 1953

The undersigned, PRECISION RECAPPING EQUIPMENT COMPANY, a corporation of Bibb County, Georgia, hereby promises to pay to the order of C. O. DENNIS, at any bank in the City of Macon, State of Georgia, U.S.A., the sum of One Million Five Hundred Thousand ($1,500,000.00) Dollars, for value received, with interest from date at the rate of 2½ percent per annum, in 150 monthly instalments, each for the sum of $10,000.00, interest on the decreasing balance of principal being payable with each instalment of principal. The first such instalment to be paid November 1, 1953 and each instalment to be paid on the first day of each succeeding calendar month.

Should default occur in any payment or payments to be made as hereinabove provided, time being of the essence of this contract, and should such default continue for 90 days, the holder may at his option declare the balance of principal of this note and all accrued interest at once due and payable and may without notice exercise any right given him by law or by contract to require and enforce the immediate payment of all amounts due hereunder, with 10% upon principal and interest for attorney's fees.

Given under the hand and seal of the undersigned the day and year first above written.

PRECISION RECAPPING EQUIPMENT COMPANY,

By (S) ZEB MATTOX,

Vice President.

Attest: (S) F. J. FOURCHER,

Secretary.

ring mold component. Retreading agreed to pay Precision a license fee or royalty computed at the rate of 25 percent of its net sales of all mold stands.

The same day Precision was organized, October 1, 1953, it entered into agreements with Den-Nap and Retreading whereby Precision was to become the exclusive sales agent of both Den-Nap and Retreading. Under the terms of the agreements, Den-Nap and Retreading agreed to pay Precision a sales commission of 20 percent of the list price of their products except in certain instances Den-Nap and Retreading were entitled to deduct from the 20-percent commission the actual discounts allowed.

Prior to the issuance of the promissory notes mentioned above, petitioner and Zeb Mattox each had his accountant project the ability of Precision to make payments on the notes. The projections concluded that if Retreading and Den-Nap were not successful in their business operations and did not meet their obligations to Precision, Precision would not have the funds necessary to pay the two holders as prescribed in the notes. The holders were not, however, restricted to the earnings of the corporation; in the event of default, the notes gave petitioner and Mattox all rights existing by law or by contract to enforce payment of all amounts due. Den-Nap's ability to pay Precision was in large measure dependent upon whether or not Retreading, a substantial customer, paid its obligations to Den-Nap.

Subsequent to October 1, 1953, Retreading and Den-Nap did not fulfill their obligations to Precision. Precision did not follow the schedule of payments required under the promissory note in favor of petitioner. At no time did petitioner ever try to borrow money using the note as collateral, or sell the note, either with or without recourse.

In February 1961, Precision filed a petition for arrangement under chapter X of the Federal Bankruptcy Act. The United States filed a proof of claim asserting deficiencies in income taxes for the fiscal years ending September 30, 1963, and September 30, 1964. The deficiences were based on the disallowance of deductions claimed in those years which related to the amortization of the patents received on October 1, 1953. The trustee objected to the claim for taxes and the question was litigated, resulting in an opinion of the United States Court of Appeals for the Fifth Circuit in *United States* v. *Hertwig*, 398 F. 2d 452 (C.A. 5, 1968), reversing *In re Precision Recapping Equipment Co.*, an unreported case (M.D. Ga. 1966, 17 A.F.T.R. 2d 1149, 68–2 U.S.T.C. par. 9495).

Petitioner on his Federal income tax returns reported the payments received on the promissory note as long-term capital gain on the installment basis with a gross profit percentage of 99.93 percent (determined with $1,000 being allowed as basis). The amounts received and the

gross profit percentage reported were as follows on the returns for the years indicated:

| Year | Amount received | Gross profit percentage reported |
|---|---|---|
| 1955 | $97, 143. 30 | $97, 075. 30 |
| 1956 | 76, 013. 91 | 75, 960. 70 |
| 1957 | 114, 089. 08 | 114, 009. 22 |
| 1958 | 86, 333. 49 | 86, 273. 06 |
| 1959 | 72, 104. 39 | 72, 053. 92 |
| 1960 | 71, 110. 39 | 71, 060. 61 |
| 1961 | 4, 624. 62 | 4, 621. 38 |
| 1962 | None | None |

Respondent in his notice of deficiency determined that petitioner received payments on the promissory note for the years and in the same amounts as reported by petitioner on his returns and further determined that the amounts received were taxable in full as ordinary income. His basis for the determination was that the payments represented amounts received in liquidation of a corporate note issued before January 1, 1955, not in registered form and not with interest coupons. No basis was allowed for the note in the notice of deficiency since respondent determined that petitioners had not established any amount of basis.

OPINION

Petitioner's primary position is that he was, at the time of the transfer of the patent and patent applications to Precision, a qualified holder of these patent rights under the provisions of section 1235(b), I.R.C. 1954,[2] that he sold his undivided interest in the patents and

---

[2] SEC. 1235 [I.R.C. 1954]. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or device) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

(b) "HOLDER" DEFINED.—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(A) the employer of such creator, nor

(B) related to such creator (within the meaning of subsection (d)).

(c) EFFECTIVE DATE.—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

[Sec. 1235(d) effective prior to Sept. 3, 1958.]

(d) RELATED PERSONS.—Subsection (a) shall not apply to any sale or exchange between an individual and any other related person (as defined in section 267(b)), except brothers and sisters, whether by the whole or half blood.

patent application to Precision, and that his gain on the sale is taxable as long-term capital gain under the provisions of section 1235(a) and (c) of the 1954 Code. Petitioner states that the promissory note which he received at the time of the sale had no reasonably ascertainable value because of the speculative nature of the venture and therefore the sale transaction remained "open" until the note was sold, exchanged, or collected.

Respondent contends that the transfer by each petitioner and Zeb Mattox of $4,000 and his undivided interest in patents and patent applications to Precision on its formation in return for 40 percent of the stock of Precision and a 12½-year promissory note, unregistered, and without interest coupons, was a transfer of property to a corporation solely in exchange for stock and securities which meets all the requirements of section 112(b)(5), I.R.C. 1939,[3] and is governed by that provision. Respondent states that payments received by petitioner on the note were amounts received in retirement of a security which are ordinary income under the provisions of section 1232(a)(1), I.R.C. 1954.

Both parties agree that the letters patent, patent applications, and cash all qualify as "property" within the meaning of section 112(b)(5) of the 1939 Code. Also both parties agree that the property was transferred to the corporation by persons who were in control of that corporation immediately after the transfer within the meaning of section 112(b)(5), I.R.C. 1939.[4] It is also clear that since petitioner and Zeb Mattox each transferred the same amount of cash and other property to the corporation and received the same amount of stock and notes, the proportionate interest requirement of the 1939 Code is met in this case.

Petitioner, however, contends that the promissory note he received was not a "security" as that term is used in section 112(b)(5) of the 1939 Code. While this section unlike other provisions in the 1939 Code (sections 23(g), 23(k), 117(n)(3)) gives no definition of "security"

[3] SEC. 112 [I.R.C. 1939]. RECOGNITION OF GAIN OR LOSS.
  (b) EXCHANGES SOLELY IN KIND.—
    \*     \*     \*     \*     \*     \*
    (5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.
[Sec. 112(b)(5) was, insofar as here pertinent, carried over substantially unchanged to the 1954 Code as sec. 351.]
[4] SEC. 112(h) [I.R.C. 1939]. DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

the definition of this term has been considered in a number of cases. In *Wellington Fund, Inc.*, 4 T.C. 185, 189 (1944), we noted:

> The pertinent statutory provisions do not include any definition of the term "securities." We see no reason to assume, therefore, that such term was used with any other than its ordinary meaning.
>
> The question of the meaning of the term "securities," as used in various revenue statutes, has been considered by the courts in a number of cases. The rule appears to be settled that, where such an act does not define the term, it denotes an obligation of a character giving the creditor some assured participation in the business of the debtor, or, in other words, an investment in the business, and that the term does not include evidences of indebtedness for short term loans representing temporary advances for current corporate needs * * * [Citations omitted.]

In *Camp Wolters Enterprises, Inc.*, 22 T.C. 737 (1954), affd. 230 F. 2d 555 (C.A. 5, 1956), certiorari denied 352 U.S. 826 (1956), we noted that the line between a security and a note which is not a security within the meaning of section 112(b)(5) of the 1939 Code "is drawn somewhere between long-term bonds and short-term notes." We noted at page 751:

> The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an over-all evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since section 112(b)(5) specifically includes both "stock" and "securities."

It is well settled that a note which is the equivalent of cash should not be classed as a security under section 112(b)(5), I.R.C. 1939. In *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462 (1933), the Supreme Court held that promissory notes maturing in 45, 75, and 105 days from date of issue were "mere evidence of obligation to pay the purchase price * * * not securities within the intendment of the Act [Rev. Act 1926] and were properly regarded as the equivalent of cash."

An important factor in determining whether a note is a security within the meaning of section 112(b)(5), I.R.C. 1939, is whether it represents a continuing interest by the recipient in the corporate business. *Baker Commodities, Inc.*, 48 T.C. 374 (1967), affd. 415 F. 2d 519 (C.A. 9, 1969), certiorari denied 397 U.S. 988 (1970). *Turner Construction Co.* v *United States*, 364 F. 2d 525 (C.A. 2, 1966).

In the present case not only did petitioner own 40 percent of the shares of Precision and serve as its president, he assumed the economic risk in the new corporation by taking a note, payment of which was completely dependent on the success of the new business and to a large

extent on payments to be made to the new business by another business in which he and Zeb Mattox owned the controlling interest.

The fact that petitioner and Zeb Mattox might have "intended" to sell these patents and patent applications to Precision is not controlling. The operation of section 112(b) (5) is not optional; it is mandatory. In *Gus Russell, Inc.*, 36 T.C. 965, 969 (1961), we stated:

it is quite clear that the application of section 351 is not dependent upon whether the parties intended that a given transaction qualify under that section and thus purposely directed their transfers to further such intent. * * * [Citations omitted.]

Since the transaction here was precisely in accordance with section 351, we must conclude that the transaction resulted in nonrecognition of gain or loss, * * *

Likewise, in the instant case, since the transaction meets all the requirements of section 112(b) (5), I.R.C. 1939, it is governed by that section regardless of the "intent" of the parties.

From the facts in this case our independent determination is that the note received by petitioner was a security within the meaning of section 112(b) (5), I.R.C. 1939. However, even if our view were otherwise, we would follow the holding of the U.S. Court of Appeals for the Fifth Circuit, to which an appeal in this case would lie, in *United States* v. *Hertwig*, 398 F. 2d 452 (C.A. 5, 1968). That case held in connection with a determination of Precision's contention that its basis for amortizing the patents transferred to it by petitioner and Zeb Mattox was $3 million, that the transfer was within the provisions of section 112(b) (5), I.R.C. 1939, and that the note given for the patents and patent applications was a "security" within the meaning of that section. The facts in *United States* v. *Hertwig*, *supra*, are identical to those in the instant case, the "notes" involved in that case being the same as are involved in this case. Under our decision in *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), we would be required to hold in this case that the promissory note was a security for purposes of section 112(b) (5). However, as noted above, we also reach this same conclusion based on our independent judgment.

Having concluded that petitioner transferred his interest in the patents and patent applications to Precision in a transaction governed by section 112(b) (5), I.R.C. 1939, the question remains whether payments in "retirement" of the security petitioner received in the exchange constituted ordinary income or capital gain.

As stated in *E. D. Rivers, Jr.*, 49 T.C. 663 (1968), it is well settled that "if gain arises from the *sale* or *exchange* of a claim or chose in action, capital gains treatment results, whereas if the gain arises from the mere *collection* of a claim or chose in action, the gain is taxed as ordinary income. [Citations omitted.]" Since the payments petitioner

received were in "collection" of his note, they are ordinary income to him unless made otherwise by some provision of the Code.

Section 1232(a)(1), I.R.C. 1954,[5] does not apply to this case since the note was not in registered form when issued in 1953, and was without interest coupons and was not in registered form by March 1, 1954. The note here involved falls squarely within the exception stated in section 1232(a)(1) of the 1954 Code. Since there is no statutory provision allowing payment on petitioner's note to be treated as capital gain, petitioner's gain arising in retirement of the promissory note is ordinary income.

Petitioner cites our decision in *Estate of Willliam F. Stahl*, 52 T.C. 591 (1969), affirmed in part and reversed in part 442 F. 2d 324 (C.A. 7, 1971), for the proposition that the provisions of section 1232 of the 1954 Code are not applicable to notes issued by a corporation for a transfer of patents or patent applications since such a transaction is a "sale." Petitioner misreads our conclusion in the *Stahl* case. In that case we stated that section 1232 of the 1954 Code was not applicable to "payments made in satisfaction of notes issued as evidence of an obligation to pay a prescribed purchase price." We further noted that such notes "have no independent significance other than as evidence of an obligation to pay a prescribed purchase price." The *Stahl* case dealt with a transaction which both parties recognized as a sale or exchange of patents and patent applications in which the notes were merely evidence of the indebtedness of the corporation to the seller. The issue was whether the sale was of depreciable property so that the gain on the sale was not capital gain under section 1239 of the 1954 Code. Since we have concluded that petitioner transferred his interest in patents and patent applications to Precision for a security in a transaction falling within the provisions of section 112(b)(5) of the 1939 Code, our holding in *Estate of William F. Stahl, supra,* is not applicable in this case. We are dealing here with the retirement of a note which is a security to which section 1232 of the 1954 Code would be applicable if the note were in registered form or had interest coupons attached.

Petitioner argues that since he qualifies as a holder under section 1235(b), I.R.C. 1954, and transferred the letters patent and patent

[5] SEC. 1232. [I.R.C. 1954] BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954.)

applications to Precision, the funds he received pursuant to that transfer are properly categorized as long-term capital gain by section 1235 (a) and (c), even if the transaction falls within the provisions of section 112(b) (5), I.R.C. 1939.

Respondent contends that section 1235 of the 1954 Code is not applicable to a transfer which falls within the provisions of section 351 of the 1954 Code or section 112(b) (5) of the 1939 Code. He calls attention to our statement in *James C. Hamrick*, 43 T.C. 21, 35-36 (1964), that "Section 1235 does not have the effect of superseding section 351(a) (1) where that provision is applicable, * * *." We agree with respondent that section 1235 if applicable otherwise would not operate in this case to cause the payments petitioner received on his note to be capital gain in the years received. Petitioner transferred his patents to Precision in exchange for the note. Since the transaction fell under section 112(b) (5) of the 1939 Code, no gain or loss is recognized on that transaction whether it would otherwise be capital or ordinary. The note (security under section 112(b) (5), I.R.C. 1939) was a capital asset in petitioner's hands from the time he received it in exchange for his patents and since no gain or loss is recognized on the transaction the note takes the same basis as the patents had which petitioner apparently no longer contends was more than zero. Had petitioner sold or exchanged the note, capital gain would have resulted from that separate transaction, but as heretofore pointed out capital gain did not result from collection of the note.

Respondent contends that in any event petitioner does not qualify as a "holder" under section 1235(b) (2) since he did not acquire the patents he transferred prior to actual reduction to practice of the invention covered by the patents.

While the test of "actual reduction to practice" of an invention might be difficult to determine in some cases, this record is reasonably clear that the Napier tire-recapping apparatus and the Napier separate section ring abutment mold component were reduced to practice by the middle or latter part of July 1944 when final tests on the products were made. Respondent contends that the actual reduction to practice was even earlier when petitioner decided to manufacture these items on the basis of drawings shown to him by Napier. We need not decide whether respondent is correct in his contention since there is nothing in the record to show assignment to petitioner of the patents which he transferred to Precision prior to August 1944.

Petitioner asserts that he acquired his interests in these patents in 1943. This assertion is not supported by the record. The April 15, 1943, agreement signed only by Napier merely granted petitioner a license to use the inventions on which patents had been obtained by

Napier who had previously licensed the MacMillan Electric Mold Co. to use those same inventions. These inventions were the crude electric molds which petitioner had first seen shortly after meeting Napier. There is nothing in this record to show whether there had been an "actual reduction to practice" of the inventions covered by the patents for the crude electric molds. On January 31, 1944, petitioner received an option for 90 days for a right to an assignment of the same patent applications but no mention was made in this agreement of an assignment of the improved tire-recapping apparatus which later resulted in patent No. 2,475,579, or the abutment ring mold component which later resulted in patent No. 2,398,151.

It was incumbent upon petitioner to show that there had been an equitable assignment to him of the new Napier inventions prior to July 1944, the date these inventions were actually reduced to practice. Even if we were to infer that there was some sort of assignment of these inventions to petitioner prior to August 11, 1944, the date on which Napier assigned to the Den-Nap partnership "all of his existing inventions and applications for patents relative to the manufacture and use of electric molds in the recapping of tires, subject to such licenses and assignments as are now outstanding," such an inference would not place the assignment prior to the date of "actual reduction to practice" of the inventions.

Therefore, with respect to the Napier tire-recapping apparatus (patent No. 2,475,579) and abutment ring component (patent No. 2,398,151) petitioner was not a holder as contemplated under section 1235, I.R.C. 1954. These two patents were assigned a total value of $2,955,000 of a total assigned value of $3 million for all patents when patents were transferred by petitioner to Precision on October 1, 1953.

There is even less evidence to support the assertion that a transfer of the patents occurred prior to actual reduction to practice of the invention with respect to the other inventions. Petitioner stipulated that Retreading Equipment Co. *used* two patents, a tire-retreading apparatus and a bead-spreading device, in connection with the mold stand that it manufactured. There is no evidence to show whether these devices had been tested under service conditions prior to being assigned to petitioner and Zeb Mattox. Petitioner has failed to meet his burden of proof with respect to these devices. The same holds true for the two design patents. Petitioner admits in his brief that he was not a qualified holder of the MacMillan patent.

Our finding that the note received by petitioner was a security, thus categorizing the October 1, 1953, transaction as governed by section 112(b)(5) of the 1939 Code disposes of petitioner's alternative

argument that the transfer of his undivided one-half interest in the letters patent and patent applications was a sale or exchange of capital assets used in his trade or business and therefore the proceeds realized from the sale qualify for long-term capital gain treatment under sections 117(a)(1) and 117(g) of the 1939 Code. Section 117 of the 1939 Code requires that there be a sale or exchange of property. "It has been consistently held by this and other courts that the existence of a bona fide sale and the application of section 351 (as well as its predecessor under the 1939 Code, section 112(b)(5)), are mutually exclusive concepts." *Baker Commodities, Inc., supra* at 407.

We hold that payments received by petitioner from Precision during the years here in issue were ordinary income and not long-term capital gain.

*Decision will be entered for respondent.*