1969 CORP., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent 1969 Corp. v. Commissioner
Docket Nos. 22210-82, 22354-82, 22355-82.
United States Tax Court
T.C. Memo 1986-387; 1986 Tax Ct. Memo LEXIS 223; 52 T.C.M. (CCH) 226; T.C.M. (RIA) 86387; August 19, 1986. William L. Raby and John C. Fossum, for the petitioners. Terence D. Woolston, for the respondent. SHIELDS *224 MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioner
Docket No.
Year
Deficiency
1969 Corp.
22210-82
03/31/73
$99
03/31/74
1,530
03/31/75
1,439
03/31/76
1,120
03/31/77
3,921
03/31/78
946
Nancy R. Pitt
22354-82
12/31/76
1,940
12/31/77
3,683
12/31/78
5,248
12/31/79
10,682
Donald and
22355-82
12/31/74
1,359
Nancy R. Pitt
12/31/75
7,296
By amended answers, respondent increased the deficiency in Docket No. 22210-82 to $7,120 for fiscal year 1976 and increased the deficiency in Docket No. 22355-82 to $79,271 for calendar year 1975. After concessions, including stipulations to be bound in certain respects by decisions in related cases, [2] two issues remain for decision in these cases: (1) How and when should petitioners' partnership report certain cash and promissory notes received from third parties in exchange for the release of the third parties from liability under a lease; and (2) when may the partnership deduct the unamortized balance of certain leasehold *225 acquisition costs? FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by reference. Petitioner in Docket No. 22210-82, 1969 Corp., had its principal office and place of business at all relevant times in Tucson, Arizona, and filed income tax returns for its fiscal years 1973 through 1978, with the Internal Revenue Service Center, Ogden, Utah. All of the outstanding stock in 1969 Corp. was at all relevant times owned 50 percent by Richard L. Bloch and 50 percent by petitioner Donald Pitt, alone or in conjunction with petitioner, Nancy R. Pitt. Petitioners in Docket No. 22355-82, Donald and Nancy R. Pitt, resided in Tucson at the time their petition was filed. They filed joint income tax returns for the years 1974 and 1975 with the Ogden Service Center. Petitioner in Docket No. 22354-82, Nancy R. Pitt, *226 resided in Tucson when her petition was filed and filed returns as an unmarried head-of-household for the years 1976, 1977, 1978, and 1979 with the Ogden Service Center. In these cases all of the adjustments made by respondent to petitioners' returns arose out of transactions of ARIZ, a California limited partnership organized in 1969, in which all petitioners were partners at one time or another. Under ARIZ's original partnership agreement, 1969 Corp. was its general partner with a 5 percent interest in the partnership profits and losses while Richard L. Bloch and Donald Pitt were its limited partners with each having a 47.5 percent interest in the partnership profits and losses. The ownership of the partnership interests continued in this manner until at or about the end of 1975 when Nancy R. Pitt acquired a 4.75 percent interest from Donald Pitt. During 1976 through 1979 the partnership interests were owned as follows: 1969 Corp.
5.00 percent
Donald Pitt
42.75 percent
Nancy R. Pitt
4.75 percent
Richard L. Bloch
47.50 percent
On December 31, 1969, ARIZ acquired a dual leasehold interest in the Los Angeles International Airport Hotel (LAX Hotel). Insofar *227 as relevant here the dual leasehold interest had been created and passed along to ARIZ by the series of transactions set out below: (1) On July 28, 1962, International Airport Hotel Systems (IAHS), the owner of certain land located near the Los Angeles International Airport, as lessor, entered into a lease agreement with its wholly-owned subsidiary, Airportel, Inc., as lessee. Under the lease agreement IAHS agreed to construct upon the land a first class hotel and to lease the same to Airportel. On its part Airportel agreed to maintain and operate the hotel and pay certain specified rents.The initial term of the lease was to be for a period of 25 years, commencing on September 1, 1962 and ending on August 31, 1987, with Airportel having three options to renew of 25, 25, and 24 years; (2) On August 30, 1962, IAHS conveyed the LAX Hotel property to the Kratter Corporation. The conveyance was made subject to the lease in favor of Airportel and was accompanied by an agreement under which IAHS assigned all of its right, title and interest under the lease with Airportel to Kratter Corporation and guaranteed the performance by Airportel of all of Airportel's obligations as lessee under *228 the lease; (3) Subsequently, Kratter Corporation conveyed the LAX Hotel property to Towcrat Corporation and assigned all of its right, title and interest in and to the lease with Airportel to Towcrat; (4) On August 22, 1967, Towcrat as the owner and landlord of LAX Hotel entered into an Indenture of Lease with Countrywide Realty (Countrywide) as tenant which incorporated with certain modifications the original lease between IAHS and Airportel, including the initial term to August 31, 1987 and the three renewal options. One of the modifications was to the effect that at any time after September 1, 1977 Countrywide could terminate the lease with Towcrat, but in such event the termination by Countrywide would constitute an assignment by Countrywide to Towcrat of all of Countrywide's interest in and to the lease with Airportel. The net effect of the Indenture of Lease between Towcrat and Countrywide was to "sandwich" Countrywide into the original lease between Towcrat and Airportel. As a result, Countrywide acquired dual leasehold interests in the property, i.e., first as the lessee of Towcrat and secondly as the lessor of Airportel; (5) On or about August 23, 1967, Towcrat conveyed *229 the LAX Hotel and Towcrat's lessor position under the sandwich lease with Countrywide to four individuals who subsequently were succeeded by a partnership known as Almo Enterprises which still later was succeeded by Almo Hotel Company, another partnership; [3]
(6) On March 31, 1969, Great Plains Hotel Company succeeded to Countrywide's interests in the LAX Hotel property; and (7) On December 31, 1969, Great Plains conveyed various property interests, including the dual position it had acquired in the LAX Hotel property from Countrywide in (6) above, to ARIZ for a total stated consideration of $4,535,631.63. Thereafter ARIZ was the lessee under a lease with Almo as lessor and at the same time was lessor under the lease with Airportel. In the agreement between Great Plains and ARIZ, the parties agreed that the sum of $852,656.00 [4] would be allocated to the balance of the initial term of the sandwich lease and that the sum of $1,196,024.33 would be allocated to the three renewal terms of that lease. [5]
*230 In accordance with the agreement between ARIZ and Great Plains $852,656 was allocated by ARIZ to the acquisition costs of the remainder of the initial term of the sandwich lease and $1,196,024.63 was allocated as the acquisition costs of the three renewal terms. During 1970 through 1974 ARIZ amortized $278,040 of the $852,656 allocated to the initial term, leaving an unamortized balance of the acquisition costs of the original term at the end of 1974 of $574,616. No part of the $1,196,024.33 allocated to the renewal terms was amortized during this period. From 1970 through 1974 Airportel suffered increasing financial problems with the result that by 1974 the rents due ARIZ were in arrears and the LAX Hotel property was deteriorating. During the latter part of 1974 and the early part of 1975 ARIZ began to negotiate with Airportel and IAHS, its parent, and its guarantor under the original lease, in an attempt to rectify the situation. These negotiations ultimately led to a Settlement Agreement which was executed on August 12, 1975 by ARIZ, Airportel, IAHS, Almo, and others. Under the settlement agreement Airportel's operating lease on the LAX Hotel property was terminated and *231 IAHS was released from any and all obligations under the lease and its guarantee of Airportel's performance. In consideration for the termination of the lease and the release of IAHS from its guarantee ARIZ received (1) $450,000, (2) three interest-bearing promissory notes in the total principal amount of $1,500,000 which were executed by IAHS and secured by a mortgage on certain hotel property owned by IAHS and located in Florida, and (3) all of the stock outstanding in Airportel. The Airportel stock apparently had no value because the parties had agreed that any net assets of Airportel as of August 1, 1975 were to be remitted to IAHS. The promissory notes had an agreed fair market value in 1975 of $250,000. They were paid in full during the years 1976, 1977, 1978 and 1979. On August 13, 1975, a new lease on LAX Hotel was entered into by ARIZ and Airportel. The base term of the new lease was from August 13 to December 31, 1975. Under the new lease Airportel had two renewal options for ten years each. On its partnership return for 1975 ARIZ reported as rental receipts the cash of $450,000 and the fair market value ($250,000) of the three notes received from IAHS. On the *232 same return ARIZ expensed the balance ($574,616) of the unamortized acquisition costs allocated to the initial term of the sandwich lease. On its partnership returns for 1976 through 1979 ARIZ reported the principal payments received on the IAHS notes as long term capital gains. In his statutory notices, respondent determined that the payments received by ARIZ from IAHS in 1975 ($450,000), 1976 ($320,000), 1977 ($240,000), 1978 ($276,000), and 1979 ($664,000) constituted amounts received for cancellation of a lease and were reportable by ARIZ as ordinary income in the years received. Respondent also determined that the unamortized balance of the acquisition costs originally allocated to the initial term of the sandwich lease ($574,616) were recoverable by ARIZ through equal annual amortization allowances over the remaining life of the lease. OPINION From our detailed findings of fact it is apparent that ARIZ and Great Plains clearly, precisely, and dealing at arm's-length agreed in 1969 that the total acquisition costs of the sandwich lease was $2,048,680. The same parties, at the same time, and under the same circumstances agreed that $852,656.00 of the total acquisition costs *233 was allocable to the initial term of the lease and that the balance of $1,196,024.33 was allocable to the three renewal terms. Over the next five years ARIZ expensed and respondent did not question annual amortization allowances with respect to the initial term of the lease totaling $278,040.00. Consequently, in August of 1975, the unamortized acquisition costs allocated to the initial term of the lease was $574,616.00. Since no amortization had been claimed by ARIZ with respect to the acquisition costs allocated to the renewal terms, the total amount of $1,770,640 was still unamortized in 1975. From our findings of fact it is equally apparent that in August of 1975 Airportel and IAHS gave ARIZ $450,000 and three promissory notes having a face value of $1,500,000 and a current fair market value of $250,000 in exchange for a complete cancellation of the lease with Airportel, the release of Airportel from the rents and other amounts such as the cost of repairs due under the lease, and the release of IAHS from the guarantee of Airportel's performance under the lease. We must decide how to treat both the consideration received by ARIZ for canceling the operating lease and ARIZ's *234 leasehold acquisition costs. Cash and Promissory Notes
The consideration received by ARIZ in the 1975 transaction for canceling the lease [6] was a substitute for rental payments and, as such, constituted ordinary income. Section 1.61-8(b), Income Tax Regs.; Hort v. Commissioner,313 U.S. 28, 31 (1941). The $450,000 of cash was reportable by ARIZ as ordinary income in the year of receipt. Section 1.61-8(b), Income Tax Regs. ARIZ also was required to report ordinary income of $250,000 upon receipt of the notes because the notes had an agreed ascertainable fair market value of $250,000. Warren Jones Co. v. Commissioner,524 F.2d 788 (9th Cir. 1975). Furthermore, the 1975 transaction was closed when ARIZ received the notes and cash, and ARIZ acquired a basis of $250,000 in the notes at that time. Tombari v. Commissioner,299 F.2d 889, 893 (9th Cir. 1962). *235 The subsequent payments on the notes were separate and distinct transactions required to "stand on [their] own feet." Tombari v. Commissioner,supra at 893. ARIZ eventually collected the full amount of the notes, realizing a gain of $1,250,000. Since in 1975 there was considerable doubt whether the notes would be paid in full, as is evidenced by their low fair market value, ARIZ was entitled to fully recover its basis in the notes before reporting any gain. Liftin v. Commissioner,36 T.C. 909, 911 (1961). Consequently, the first $250,000 received by ARIZ was a recovery of basis and not reportable as income, but all subsequent receipts were reportable. Respondent contends that ARIZ's gain on the notes was ordinary income, whereas petitioner claims that the gain was capital gain. ARIZ's gain was capital gain if the retirement of the notes constituted the sale or exchange of a capital asset. Section 1222. Under section 1232, [7] the payments on the notes were amounts received in exchange for the notes [8]; therefore, the only issue is whether the notes were capital assets in ARIZ's hands. *236 Section 1221 defines the term "capital asset" as any property held by the taxpayer except certain types of property expressly listed in the statute. We find that the notes fall within this statutory definition since they do not come within any of the listed exclusions. We also find that the notes do not come within any of the judicial exceptions to the statutory definition found in the cases cited by respondent, including Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). However, all of these cases are clearly distinguishable from our case on their facts. We conclude, therefore, that the notes were capital assets and that ARIZ's gain was capital gain. Leasehold Acquisition Costs
ARIZ's initial cost basis in the sandwich lease was $2,048,680, and $1,770,640 of this amount was unamortized at the end of 1974. Under section 1.162-11(a), Income Tax Regs., these unamortized costs are to be deducted over the unexpired term of the lease. *237 Section 178 contains the statutory test for determining the proper amortization term. That section generally provides that if less than 75 percent of the cost of acquiring the lease is attributable to the initial term, the amortization term includes any renewal periods, unless the lessee establishes that it is more probable that the lease will not be renewed. In this case, approximately 42 percent ($852,656) of the total acquisition costs ($2,048,680) was allocated to the initial term of the sandwich lease. The balance or 58 percent was allocated to the renewal periods. Consequently, under section 178 the amortization term include the renewal periods unless petitioners have established an unlikelihood of renewal. We find nothing in the record to support petitioner's claim that in 1975 it was more likely than not that the sandwich lease would be terminated by ARIZ on September 1, 1977. [9] To the contrary, there is no evidence that ARIZ attempted to terminate the lease in 1977, and as of the date of trial, apparently Almo and ARIZ were both still working hard to maintain their lessorlessee relationship. Therefore, the balance of $1,770,640 in leasehold acquisition costs should be *238 amortized over the balance of the initial term plus the renewal periods, i.e., from 1975 through 2061. To reflect the foregoing, as well as the stipulations and concessions of the parties, Decisions will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith for trial, briefing, and opinion: Nancy R. Pitt, docket No. 22354-82 and Donald Pitt and Nancy R. Pitt, docket No. 22355-82.↩
2. The parties have stipulated to be bound on certain issues by our decision in Moss v. Commissioner,T.C. Memo. 1986-128↩. Accordingly, appropriate adjustments will be made under Rule 155 in Docket No. 22354-82 and Docket No. 22210-82.
3. For easy reference, both Almo Enterprises and Almo Hotel Company will hereinafter be referred to as Almo inasmuch as their interests appear to be identical.↩
4. This figure represents the excess of the rent to be received by ARIZ from Airportel through August 31, 1987 over the amount of rent ARIZ was obligated to pay out under the sandwich lease. It also represents approximately 42 percent of the total leasehold acquisition costs of $2,048,680. ↩
5. The sandwich lease of August 22, 1967 between Towcrat (lessor) and Countrywide (lessee) incorporated the terms of the original operating lease which provided for an initial lease term ending August 31, 1987 and three renewal periods ending in 2061.↩
6. In spite of petitioners' contention to the contrary, we find no reason to separately allocate any part of the cash or notes to the release of the guarantee. Once the operating lease was canceled, IAHS no longer had any obligations, and the guarantee was meaningless.↩
7. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
8. Relying on Estate of Stahl v. Commissioner,52 T.C. 591 (1969), affd. in part 442 F.2d 324 (7th Cir. 1971), respondent contends that section 1232 does not apply to these notes because they were merely evidence of IAHS's obligation to pay. However, characterizing the notes in such manner is inconsistent with respondent's position, as stated in its answer, that the notes were includable in income when received. See Williams v. Commissioner,28 T.C. 1000, 1001↩ (1957).
9. One of the modifications in the original sandwich lease between Towcrat and Countrywide of August 22, 1967 gave Countrywide (ARIZ's predecessor) the right to terminate the sandwich lease after September 1, 1977.↩