334 F.2d 830
 P & D SALES & MFG. CO., a division of the Neff and Fry Company, Plaintiff-Appellee,
v.
Billy B. WINTER and New Holland Machine Company, a division of Sperry Rand Corporation, Defendants-Appellants.
 No. 14401.
 United States Court of Appeals Seventh Circuit.
 July 13, 1964.
 
 Thomas F. McWilliams, Edward W. Osann, Jr., John Bundock, Jr., Chicago, Ill., Mann, Brown & McWilliams, Wolfe, Hubbard, Voit & Osann, Chicago, Ill., of counsel, for defendants-appellants.
 Kenneth T. Snow, Edward L. Benno, Snow & Benno, Chicago, Ill., for P & D Sales & Mfg. Co., plaintiff-appellee.
 Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.
 KNOCH, Circuit Judge.
 
 
 1
 Plaintiff-appellee, P & D Sales & Mfg. Co., hereinafter called "P & D," brought action in the United States District Court against the defendants-appellants, Billy B. Winter, owner of United States Letters Patent No. 2,940,639, and New Holland Machine Company, hereinafter called "New Holland," his exclusive licensee.
 
 
 2
 P & D also sought adjudication of non-infringement for the mechanized live stock feeders which it makes and sells.
 
 
 3
 The defendants denied the plaintiff's allegations and counter-claimed for infringement of the Winter patent. The defendants stated that they would rely on claims 11, 12 and 16 as typical of the claims infringed, but they reserved the right to rely also on claims 7, 9, 10, 17 and 18. No evidence was introduced respecting the validity or the infringement of the remaining ten claims. The plaintiff asserts that these ten claims differed from the eight in issue mainly by inclusion of the additional element of a cover for the tube, and that the evidence offered respecting the eight claims was equally applicable to the other ten.
 
 
 4
 The District Court entered the findings of fact, conclusions of law, and judgment submitted by the plaintiff, holding all the Winter claims invalid and not infringed, and directing that plaintiff recover its attorneys' fees in an amount to be settled at a later hearing.
 
 
 5
 The Winter patent covers a "tubular feeding device," a mechanical farm livestock feeder, designed to fill the need occasioned by the diminishing numbers of available farm labor for feeding by hand from small containers, a practice which is no longer considered the most satisfactory method; to avoid disturbance to cattle by the presence of people during feeding time; to permit two, three or four daily feedings as desired; to provide a measured ration to keep the animals within a close percentage of their full feeding capacities and allow more efficient gain in weight per unit of ration to secure a better carcass dressing percentage toward leaner cuts.
 
 
 6
 The principal objects of the invention were:
 
 
 7
 "* * * to provide a livestock feeding apparatus which, when operated, delivers feed at various points along the length of the feeder simultaneously so that the feed is then available to every animal and the stock do not congregate at a limited number of feeding positions."
 
 
 8
 and
 
 
 9
 "* * * to provide an apparatus with which the daily ration of feed given to each animal may be increased or decreased by (1) increasing or decreasing the frequency of feeding, or (2) by changing the quantity of feed delivered each feeding."
 
 
 10
 The exemplary form shown in the Winter patent drawings comprises a tube with an opening extending the entire length of the tube, which can be covered by a fixed plate or cap. This tube is supported by gears fastened to it which rotate it. From a hopper adjacent to one end of the tube, various types of feed can be introduced to an auger which rotates inside the tube. In operation, the tube is held stationary while the rotating auger advances the feed between the flights of the auger through the entire length of the tube. There are means for then rotating the tube to dump the feed on the ground or in a trough. After discharge of the feed, the tube rotates back to its position with the discharge opening at the top.
 
 
 11
 One disclosure shows a pressure switch at the end of the tube which is activated by the auger when it advances the feed to the end of the tube. The switch causes the rotation and discharge of the distributed feed. The whole operation can be controlled by conventional electrical components or other timer controls which allow substantial quantities of feed stored in a silo or hopper to be distributed to the cattle at various pre-selected times during the day. The feed tubes may be grouped end to end to serve a plurality of feed stations for large numbers of animals.
 
 
 12
 Not only is the repeated daily manual labor of hand feeding eliminated, but also the crowding of animals at one point with resultant danger of injury to the animals or to the personnel handling the feed, and the risk of uneven supply of feed to the various animals. Identical feedings of mixed fine and bulky feed for each animal is assured as the mixed material is carried as a unit between the flights of the auger to the various discharge positions along the length of the tube.
 
 
 13
 Mr. Winter testified that he had been a farmer most of his life, and that in 1955 he was searching for a mechanical feeder because his physical condition rendered the then routine hand feeding methods infeasible. He found none available and designed his own apparatus. He showed a small crude working model to Tillman Bubenzer, then manager of Conner Prairie Farms, a 1250 acre Indiana farm operation directed principally to livestock. Mr. Bubenzer agreed to undertake exploitation of the invention on a percentage of profits basis. Mr. Winter engaged Warren Salzman, a mechanical engineer, to make a working model in accordance with Mr. Winter's ideas. Mr. Winter is not himself an engineer, but he indicated the controls and the cycle desired, leaving the selection of the particular electrical components and wiring diagram to Mr. Salzman, who was also to receive a percentage as recompense for his work.
 
 
 14
 The resultant model, though small enough to be carried in an automobile, had all of the controls, and was demonstrated late in 1956 or early in 1957 to Dr. Damon Catron at Iowa State College and to various companies. Favorable statements and requests for a full scale working model from those who saw the demonstrations resulted in the installation of such full working model on the Conner Prairie Farms. Under date of March 31, 1959, Mr. Winter gave New Holland an exclusive license under any patent which Mr. Winter acquired on his feeder. New Holland completed its engineering for commercial production in June 1961 and distributed a number of units for test purposes. By October 1962 commercial production and sale began. About 230 machines were sold prior to trial of this case.
 
 
 15
 It is significant that after acquiring the Winter license, New Holland secured a license under the Hansen patent on a later invention for mechanical feeding of livestock. After testing the device New Holland cancelled its Hansen license even though it provided for smaller royalty payments than the Winter license.
 
 
 16
 Although P & D argue that some of the evidence shows the New Holland commercial feeder not to have all of the features of the Winter claims (e. g. Clarence Tanner, a farmer who bought one, testified that it worked only when the tube was filled full length) it is clear from the record that the New Holland commercial feeder does come within the claims of the Winter patent.
 
 
 17
 At the trial, the plaintiff relied on three prior art patents: Philipp 2,630,906; Virgil 2,646,023, and Huggins 1,429,287. We have examined these patents with great care.
 
 
 18
 The Virgil patent was before the Patent Examiner when the Winter patent was granted. It concerns an "automatic fowl feeding device." We agree with defendants that the Virgil structure in operation is intended to keep all of a number of individual feed troughs filled at all times and does not accomplish the results of Winter. In Virgil discharge openings in fixed tubes leading from a central hopper are set above open troughs in a feed area. As augers are rotated feed is delivered from the central hopper through the fixed tubes to the openings and discharged into the open troughs. When the discharged feed in one trough piles up to the opening, it closes that opening and allows the auger to advance the feed to the next discharge opening over another trough. When all troughs are full, a pressure switch de-energizes the motor rotating the auger, until the feed in the trough is at a low level permitting the pressure switch to make contact and re-energize the motor.
 
 
 19
 Huggins appears to be designed solely for liquid. It includes a strainer screen to halt passage of solids. We see no means for handling hay or grain feed or for conveying such solids from one end of the tube to the other. The tube has a series of fixed holes. After the tube is full, with the holes at the top, it can be rotated manually to move the holes to the bottom or discharge position.
 
 
 20
 Plaintiff's expert witness, Paul O. Pippel, thought that Philipp's patent for a "silage distributor" was the closest of the three to Winter. Basically Philipp has a rotary screw conveyor with the screw and the tube enclosing it rotating about their common axis, "the tube having a spiral slot so that the material is distributed longitudinally of the tube." The tube and screw feeder both rotate. There is a hopper and a plurality of tubes connected together rotating in unison through a belt connection driven by a motor. The rotation allows the spiral slot, which resembles the stripe on the traditional barber's pole, to move and discharge the feed being advanced by the screw conveyor through the pull of gravity. The feed is thus deposited in a progressive fashion beginning at the hopper end and moving the length of the tube as the tube rotates. Thus, as defendants point out, fine grain or mineral supplements may fall out of the slot at any time when it is in a downward position instead of being pushed along to the end of the tube. The slot is fixed. With a slot wide enough for bulky haylage the fine material would fall in the trough closest to the hopper. With a slot narrow enough to retain the fine grains, the coarse material would not be discharged at all.
 
 
 21
 The record shows that no model of Philipp was ever made. Shortly after securing the Winter license, New Holland acquired the Philipp Patent by assignment, in return for a hay baler valued at approximately $1,600. New Holland subsequently decided that the Philipp Patent, which it now owned outright, was not suitable for commercial production.
 
 
 22
 The Winter feeder was described fully in illustrations and text reports in farm trade journals beginning as early as the Autumn, 1957, issue of THE FARM quarterly, long before the origin in 1959 of the Dudte feeder (from which the accused device was derived) some two and one-half years after Mr. Winter filed his patent application on November 19, 1956. Mr. Dudte was using a continuously rotating tube with holes spirally positioned longitudinally and an auger within rotating at a different speed from the tube. Moridge Manufacturing Company built a unit to his specifications which was installed on his farm in March 1959.
 
 
 23
 Plaintiff protests defendants' assertions that Mr. Dudte's feeder presented problems. Mr. Dudte testified that it worked satisfactorily for a considerable period. However, when asked whether the original unit was still in existence, he said it was in his shed, "being modified at the present time; experimented with, I will say."
 
 
 24
 Arthur R. Funk's deposition refers to problems in evenness of distribution. After seeing the Dudte feeder in operation, Mr. Funk had Moridge Manufacturing Company install a feeder on his farm in the fall of 1959. The Moridge engineers made a number of successive changes. By July 1960, Mr. Funk "was about ready to give up." Ultimately the structure and operation of the Dudte feeder were changed. Slots were put at the top along the length of the tube which was not allowed to rotate until filled its entire length, and only then rotated to discharge the material simultaneously the length of the tube. This made the device substantially identical to Winter. After this, Mr. Funk said "it worked just like a charm."
 
 
 25
 Elbert J. Guyer, owner of Moridge Manufacturing Company, also spoke of the gradual trial and error changes made in the Funk installation to meet such problems as occasioned by wet silage which would not fall out of the holes but would be pushed to the far end of the tube, and free-flowing grain which fell out before it was half-way through. He testified in his deposition that short lengths worked quite well but that the device would not work for 195 or 196 feet.
 
 
 26
 Moridge Manufacturing began commercial manufacture and sale of the improved Funk feeder, which was shown at the Three-I Show at Great Bend, Kansas, where representatives of P & D saw it and shortly made arrangements to handle its sale. C. Kenneth Jones, P & D's Sales Manager, testified that although P & D had been engaged in the farm implement business for more than 60 years and he had attended a great many trade shows, he had never seen a feeder like Moridge's (which was now substantially identical to Winter) and that he immediately recognized the great sales potential for it.
 
 
 27
 As the witnesses testified, and as the District Court found, the accused devices sold by P & D were substantially identical in design to the final version of the Funk feeder made by Moridge. The original Dudte-type feeder installed on the Funk farm initially resembled the Philipp feeder, but, after many modifications, it was completely altered to correspond to the earlier Winter structure. We must conclude that the District Court's finding of non-infringement of Winter by the P & D accused device was clearly erroneous.
 
 
 28
 We also believe that the Winter patent was clearly valid, and not anticipated by the prior art patents which do not singly or together disclose the invention.
 
 
 29
 P & D argues that the question of what constitutes patentable invention breaks down into component parts: what was the prior art, what the patentee did to improve on it, and whether what he did is "invention." As to the facts concerning prior art, determined on testimony and documentary or physical exhibits, P & D would agree that the documentary and physical exhibits speak for themselves. On review, P & D urges that these are facts subject to Rule 52(a), Federal Rules of Civil Procedure, and the exception found in the Documentary Rule, and must be accepted by this Court unless "clearly erroneous." With respect particularly to the element of novelty, P & D points out that determination of this element often finds its genesis in the testimony of experts heard and seen by the Trial Judge whose findings plaintiff feels should fall within the scope of Rule 52(a).
 
 
 30
 It is true that the Trial Judge heard and saw witnesses whose credibility he was in a particularly good position to judge. However, some of the most important factual evidence is contained in depositions. In weighing this testimony we suffer under no worse handicap than the District Judge.
 
 
 31
 While this Court did not see the demonstration of the device involved, the full and detailed explanations accompanying such demonstration are found in the record. We have a comparatively simple invention here, and this Court can easily understand it from the exhibits in the record. The invention is perhaps deceptively simple. It seems obvious now. But it was not obvious to the experienced Moridge engineers who were skilled in the art.
 
 
 32
 There is a presumption of validity arising from grant of the patent by the Patent Office. Title 35 U.S.C. § 282. Plaintiff had the burden of proving invalidity. Hazeltine Research, Inc. v. Dage Electric Co., 7 Cir., 1959, 271 F.2d 218, 224. This presumption was strengthened in this case by the usefulness of the invention which fulfilled a long felt want, Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 1950, 179 F.2d 401, 404, and it was not until a considerable time after Mr. Winter's invention that others working in the field also made this apparently simple discovery. Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 1949, 178 F.2d 794, 801, and cases there cited.
 
 
 33
 Commercial success also bolsters the validity of this patent. Shumaker v. Gem, 7 Cir., 1962, 311 F.2d 273, 276. The Winter invention represents a novel combination of elements cooperating to produce a new and useful result. Copease Mfg. Co. v. American Photocopy Equipment Co., 7 Cir., 1962, 298 F.2d 772, 781.
 
 
 34
 P & D contends that presumption of validity is destroyed here by failure to cite the Philipp patent as pertinent prior art, and argues that we may not assume that the Examiner considered Philipp and found it irrelevant, but must consider rather that the Examiner overlooked Philipp.
 
 
 35
 When New Holland took over prosecution of the Winter patent application, New Holland must, of course, have known of the Philipp patent, ownership of which it had acquired. P & D cites New Holland's failure to disclose the Philipp patent as such inequitable conduct as would justify the award of attorneys' fees to P & D in this case.
 
 P & D's view is:
 
 36
 "With the obvious pertinency of the prior Philipp patent to Winter's asserted invention and with New Holland's knowledge of Philipp it can only be assumed that the defendants intentionally avoided informing the Patent Office of Philipp while they prosecuted Winter's application to a patent, knowing they would secure patent coverage broader than Winter was entitled to receive."
 
 
 37
 Thus P & D would have us believe that New Holland deliberately concealed the existence of a patent which New Holland owned outright in order to secure broader coverage for another patent under which New Holland was only a licensee obligated to pay royalty. P & D argue that there was such collusion here to secure a patent monopoly as to constitute a conspiracy in restraint of trade in violation of § 1 of the Sherman Act. As further justification for award of attorneys' fees here, P & D points out that attorneys' fees may be recovered as damages under the Sherman Act.
 
 
 38
 We need not deal with presumptions as to whether or not the Patent Examiner saw the Philipp patent, which was a matter of public record. In our opinion, there was no obligation on New Holland or Mr. Winter to bring the Philipp patent to the Examiner's notice. Our study of the Philipp patent satisfies us that it covered a completely different device. The conclusion that defendants were guilty of inequitable conduct before the Patent Office is clearly in error.
 
 
 39
 We feel similarly that the Trial Court erred in holding that Mr. Winter was not the sole inventor and that the patent was invalid for that reason. The findings do not indicate the basis for this conclusion, but perhaps the District Judge considered Mr. Salzman, the engineer employed by Mr. Winter, to be a joint inventor. Mr. Winter is not himself an engineer familiar with specific electrical details, but close scrutiny of his testimony shows that when he retained Mr. Salzman to build a model for exhibition, he did set out exactly what he wanted done. He does not claim invention of specific switches, motors or timers. The patent states that the mechanism is controlled and actuated by conventional electrical components. Even if Mr. Salzman did make discoveries ancillary to the plan of his employer, Mr. Winter is still the inventor of the original improved principle and the ancillary discoveries may be embodied in his patent. Agawam Woolen Co. v. Jordan, 7 Wall. 283, 74 U.S. 583, 603, 19 L.Ed. 177, 182 (1868).
 
 
 40
 Mr. Salzman's interests are in no way adverse to those of defendants. In return for his efforts in building the exhibition model, he is receiving a portion of the royalties. If Mr. Salzman were a joint inventor here, a conclusion which we do not find supported by this record, then the patent would not necessarily be rendered invalid. A patent may be corrected pursuant to Title 35 U.S.C. § 256 which provides for addition of a joint inventor omitted by error.
 
 
 41
 Our study of the Winter patent does not disclose it to be deficient (as found by the District Court) in meeting the requirements for full, clear and concise terms to enable one skilled in the art to use the invention, nor do we find the claims indefinite or indistinct.
 
 
 42
 As stated in Copease Mfg. Co. v. American Photocopy Equipment Co., supra, at page 781 of 298 F.2d:
 
 
 43
 "Rule 52(a) does not require us either to accept findings unsupported by the evidence or clearly erroneous, nor require us to respect conclusions which do not rest properly on the facts of the case. Campana Corp. v. Harrison, 7 Cir., 114 F.2d 400, 405."
 
 
 44
 Although plaintiff suggests some reasons for the award of attorneys' fees here, the Trial Court has not indicated the basis for such award. In Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 7 Cir., 1956, 238 F.2d 867, 874, then Chief Judge Duffy, speaking for the Court, cited with approval Laufenberg, Inc. v. Goldblatt Bros., Inc., 7 Cir., 187 F.2d 823, 825, to the effect that:
 
 
 45
 "`[T]he trial court should make a specific finding to show the basis upon which the award of attorney's fees is made.'"
 
 
 46
 adding:
 
 
 47
 "This rule was adopted as a `sound one' in Pennsylvania Crusher Co. v. Bethlehem Steel Co., 3 Cir., 193 F.2d 445, 451. In Laufenberg we pointed out, * * * that an award of attorney's fees is not the usual or customary procedure in a patent case, and that such an award does not follow as a matter of course from the decision of the suit as in the case of ordinary costs."
 
 
 48
 We have considered all other arguments advanced by P & D but deem it unnecessary to comment on each. None of them operates to alter our conviction that the judgment of the District Court must be reversed and this cause be remanded to the District Court for further proceedings in accordance with the tenor of this opinion.
 
 
 49
 Reversed and remanded with directions.