Clement O. DENNIS and Genia Lee Dennis, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 72–1813.

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1973.

**276**

William A. Burnham, Louis Regenstein, Atlanta, Ga., Charles M. Cork, Macon, Ga., for petitioners-appellants.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, Lee H. Henkel, Jr., Acting Chief Counsel, Internal Revenue Service, Raymond W. Sifly, John A. Townsend, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before RIVES, THORNBERRY and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This is an appeal from a decision of the United States Tax Court holding that collections upon a corporate note received by taxpayer-appellant in a transaction made nontaxable by Section 351 of the 1954 Code must be reported as ordinary income in the year of receipt. We hold, in affirming the Tax Court, that its factual findings are not clearly erroneous and that taxpayer was not entitled to capital gain treatment on the amounts collected on the corporate note.

The factual context out of which this appeal arises is fully set forth in the Tax Court's opinion, reported at 57 T.C. 352, 352–360 (1971). Accordingly, we set forth only those facts necessary to understand our disposition of the issues raised on this appeal.

In 1939 taxpayer, Clement O. Dennis, entered the tire recapping business in Macon, Georgia, with his partner A. L. Jarvis. The Dennis-Jarvis Tire Co. used steam operated tire recapping equipment to mold tires by applying heat. In 1943, taxpayer met J. W. Napier, a retired engineer who had invented two electric tire recapping devices [hereinafter the "original inventions"]. Napier had previously filed for Letters Patent for the original inventions in 1942.[1] Taxpayer was convinced that Napier's original inventions would be commercially feasible if they were improved by adding certain features. In April of 1943 taxpayer and Napier discussed the possibility of Napier granting taxpayer exclusive rights and license to manufacture, use, and sell electric recapping molds of the design specified in Napier's 1942 patent application for the original inventions, subject only to a prior agreement covering ten Southern States. This understanding was reduced to writing but was signed only by Napier.

On January 31, 1944, Napier granted taxpayer a ninety day written option to an assignment of Napier's rights in the original inventions.[2] Taxpayer agreed

1. The serial numbers of the applications were 427,483 and 463,726.

2. This agreement was subject only to the aforementioned license covering ten Southern States.

that if the rights in the original inventions were assigned to him, he would "diligently and promptly enter upon the manufacture and sale or lease of the apparatus and the practice of the method described in said applications and/or letters patent [for the original inventions] . . . . ." Taxpayer exercised this option within the prescribed time. He and Jarvis then formed another partnership in May of 1944, the Den-Nap Electric Mold Co. [hereinafter "Den-Nap"], and began manufacturing molds for the recapping of automobile tires.

In the meantime, Napier at taxpayer's suggestion, had been working throughout this period refining and improving the original inventions. On May 12, 1944 Napier and taxpayer consulted with a firm of patent attorneys in Washington, D. C. concerning the advisability of filing further patent applications.

During the middle or latter part of July 1944, Den-Nap made final tests on the Napier tire recapping apparatus [hereinafter the "recapping apparatus"] and the Napier separate section ring abutment mold component for tire recapping apparatus [hereinafter the "mold component"], both of which were refinements of Napier's original inventions. [The recapping apparatus and the mold component together are hereinafter referred to as the "improved inventions."] Den-Nap then entered into a written agreement with Napier on August 11, 1944. This agreement included an assignment by Napier to Den-Nap of all of his existing inventions and applications for patents relative to the manufacture and use of electric molds in the recapping of tires subject only to existing assignments.

On September 6, 1944, Napier applied for a patent for the mold component. This application had been assigned to taxpayer on August 29, 1944.[3] On April 15, 1945, Napier applied for a patent for the recapping apparatus. This application had been assigned to taxpayer on March 27, 1945. A continuation application was substituted for the April 15, 1945 application on December 5, 1946.[4] Napier died in 1949 and his widow subsequently released all claims that she might have both to the two Letters Patent that had been issued for the improved inventions as a result of the aforementioned applications and to any rights arising out of the August 11, 1944 agreement between Napier and Den-Nap.

After a number of corporate transactions, which are irrelevant for the purposes of this appeal, taxpayer assigned a one-half undivided interest in the Letters Patent for the improved inventions to Zeb Mattox. In order to enable both taxpayer and Mattox to receive payments on these patents, they were assigned on October 1, 1953, jointly with certain patent applications owned by Mattox, to Precision Recapping Equipment Co. [hereinafter "Precision"], a corporation formed under the laws of the State of Georgia for the purpose of (1) licensing the patents to Den-Nap and Retreading Equipment Co. of Charlotte, North Carolina and (2) acting as their sales agency. Taxpayer and Mattox owned eighty percent of the stock of Precision and served as its president and vice president respectively. The new corporation was initially capitalized with $10,000 cash and the patents and patent applications transferred to Precision were valued at $3,000,000. Taxpayer and Mattox each received a promissory note in the face amount of $1,500,000, with each note providing for 150 monthly installments of $10,000 each with interest at 2½ percent per annum [hereinafter "the note"]. The note was not issued in registered form and did not bear interest coupons.

---

3. On April 9, 1946, Letters Patent No. 2,398,151 were issued for this device in the name of taxpayer as assignee of Napier.

4. On July 5, 1949, Letters Patent No. 2,475,579 were issued on this application in taxpayer's name as assignee of Napier.

Taxpayer reported payments he received between 1955 and 1962 on the note as long term capital gain received on an installment obligation. He claimed a basis of $1,000 and determined that the note had a gross profit percentage of 99.93%. Taxpayer reported the following amounts received and gross profit percentage on his Federal Income Tax return for the years in question:

| Year | Amount received | Gross profit percentage reported |
|------|-----------------|----------------------------------|
| 1955 | $97,143.30 | $97,075.30 |
| 1956 | 76,013.91 | 75,960.70 |
| 1957 | 114,089.08 | 114,009.22 |
| 1958 | 86,333.49 | 86,273.06 |
| 1959 | 72,104.39 | 72,053.92 |
| 1960 | 71,110.39 | 71,060.61 |
| 1961 | 4,624.62 | 4,621.38 |
| 1962 | None | None |

57 T.C. at 360. Reasoning that the amounts received were ordinary income and did not qualify for capital gain treatment, the Commissioner of Internal Revenue determined that taxpayer's returns were deficient.

Taxpayer petitioned the Tax Court for a redetermination of the deficiencies asserted by the Commissioner. He argued that at the time of the transfer of the patents and patent applications to Precision he was a qualified holder of these patent rights and that he was thus entitled to capital gain treatment upon the transfer to Precision under the provisions of section 1235 of the 1954 Code.[5] He also contended that because the note was an evidence of an installment obligation, payments received on it were entitled to capital gain treatment. Finally, he argued in the alternative, that because of the speculative nature of the venture, the note that he received at the time of the transfer to Precision had no reasonably ascertainable value, and that therefore the transaction remained "open" until the note was sold, exchanged, or collected. Payments on the note would, under this theory, be entitled to capital gain treatment provided by Burnet v. Logan, 1931, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143, because they would be viewed as having been collected pursuant to the sale of a capital asset.

The Tax Court held: (1) that Dennis was not a "holder" as defined by Section 1235, (2) that the note he received from Precision was a security received in a tax free exchange of property under section 351 of the 1954 Code,[6] (3) that even if taxpayer was a holder under sec-

5. § 1235. *Sale or Exchange of Patents.*

(a) *General.*—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

(b) *"Holder" Defined.*—For purposes of this section, the term "holder" means—

(1) any individual whose efforts created such property, or

(2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(A) the employer of such creator, nor

(B) related to such creator (within the meaning of subsection (d)).

(c) *Effective Date.*—This section shall be applicable with regard to any amounts received, or payments made, pursuant to a transfer described in subsection (a) in any taxable year to which this subtitle applies, regardless of the taxable year in which such transfer occurred.

(d) *Related Persons.*—Subsection (a) shall not apply to any sale or exchange between an individual and any other related person (as defined in section 267 (b)), except brothers and sisters, whether by the whole or half blood.

6. Section 351. Transfer to Corporation Controlled by Transferor

(a) *General Rule.*—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immedi-

tion 1235, the capital gain treatment accorded by section 1235 is not applicable in a section 351 transfer, and finally (4) that amounts collected in payment of a note received in a section 351 transfer do not receive capital gain treatment unless that note independently qualifies for capital gain treatment under section 1232.

Taxpayer and the Commissioner have entwined this Court in a rather uneasy dialectic. They do not agree on the correctness of the Tax Court's fact findings, on its interpretation of applicable sections of the Internal Revenue Code, or on its application of the law to its fact findings.[7] They do agree, however, that their conflict can be resolved only by this Court's determining whether the amounts received by taxpayer on the note were taxable to him as ordinary income or as capital gain. Out of this Hegelian struggle arises a result that we trust will be intellectually, if not financially, satisfying to taxpayer.

██ Taxpayer is cognizant of the general proposition that, absent special statutory authorization, collection on a note does not qualify for capital gain treatment. Fairbanks v. United States, 1939, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855; Pounds v. United States, 5 Cir. 1967, 372 F.2d 342, 349; Riddell v. Scales, 9 Cir. 1969, 406 F.2d 210, 212. He therefore posits three different propositions that he contends authorize capital gain treatment for the amounts he collected on the note:

(1) Taxpayer contends that the Tax Court was clearly erroneous in finding that he was not a "holder," as that term is defined in Section 1235(b), of the improved inventions prior to their reduction to practice in July of 1944. He advances two different factual contentions in support of this argument. First, he insists that the rights were assigned to him by Napier prior to the reduction of the improved inventions to practice, pursuant to taxpayer's exercise of the January 31, 1944 option agreement.[8] Taxpayer's second factual argument, raised for the first time on this appeal, is that he was a joint inventor of the improved inventions. Taxpayer argues that because he is a "holder", the payments received on the note qualify for capital gain treatment authorized by Section 1235(a), regardless of the fact that both the Tax Court and this Court[9] found

---

ately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

(b) *Receipt of Property.*—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus (B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

Section 351 of the 1954 Code, insofar here pertinent, reenacted the provisions of section 112(b)(5) of the 1939 Code.

7. Nor is this the first time that the facts of this case have been before us. *See* note 9, *infra.*

8. Throughout taxpayer's brief he refers to a January 11, 1944 agreement. We find no such agreement in the Record on Appeal, but presume taxpayer is referring to the January 31, 1944 agreement which is contained in the Record.

9. In United States v. Hertwig, 5 Cir. 1968, 398 F.2d 452, a case involving the tax treatment of the note involved in this transaction, this Court relied on the reasoning of Camp Wolters Enterprises v. Commissioner, 5 Cir. 1956, 230 F.2d 555, in holding that:

" . . . it is clear that the notes received by Dennis and Mattox were 'securities' within the meaning of § 112 (b)(5).

"The exchange did not represent an isolated sale to Precision but was part and parcel of its formation. On the day it was formed, Dennis and Mattox each transferred cash to the corporation in return for stock, and the patents in return for the unsecured 12½ year notes. As in *Camp Wolters,* the notes and the stock were equally evidence of

that the note was a security received in a tax-free exchange. Taxpayer argues further that since section 1235 governs this transaction there is no need for the note to be in the form required of notes receiving capital gain treatment pursuant to section 1232.[10]

(2) Taxpayer next argues that even though the note has been characterized as a security received in a tax free exchange, the note had no independent significance and thus was not the type of note contemplated by section 1232. Not having any independent significance, it was merely evidence of an installment sale, and payments received pursuant to it thus qualified for the long-term capital gain treatment provided by section 453(d).[11]

(3) Finally, taxpayer urges that both Section 351 of the 1954 Code and Section 112(b)(5) of the 1939 Code are inapplicable because taxpayer received the note in an "open transaction," the note having no ascertainable fair market val-

ue. He urges that Section 351 and its predecessor apply only to gains that are realized but not recognized and that no gain was realized upon the transfer to Precision. The taxpayer argues that under this theory the amounts received in payment of the note should be accorded the capital gain treatment which they would receive if the tax consequences of the transfer were determined upon actual receipt of payments on the note in accordance with the "open transaction" doctrine of Burnet v. Logan, 1931, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143.[12]

In response, the Commissioner argues that the Tax Court finding that taxpayer was not a "holder" as defined by section 1235 is not clearly erroneous, and that in any event section 1235 is inapplicable to a section 351 transaction. He argues that the finding of the Tax Court, and of this Court in United States v. Hertwig, 5 Cir. 1968, 398 F.2d 452,[13] that the note was a security received in a tax-free exchange, precludes

---

participation. The patents were the primary asset of the new corporation. Their determined value of $3,000,000.00, and the notes of a like amount, contrasted with Precision's $10,000.00 capitalization preclude any finding but that Dennis and Mattox, as holders of the notes, had a continuing proprietary interest in the success of the venture. That Dennis and Mattox expected the notes would be paid does not alter this conclusion."

398 F.2d at 455.

10. SEC. 1232. Bonds and other evidences of indebtedness.

(a) *General Rule.*—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof

(1) *Retirement.*—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued wtih interest coupons or in registered form, or to those in such form on March 1, 1954).

11. § 453(d) *Gain or loss on disposition of installment obligations.*—

(1) *General rule.*—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) *Basis of obligation.*—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

12. Taxpayer does not contest the finding that the note had no basis.

13. *See* note 9, *supra.*

taxpayer from arguing that the payments he received on the note are entitled to the long-term capital gain treatment that might be available if the payments were received pursuant to an installment sale or an open transaction. It is the Commissioner's contention that since payments on notes do not ordinarily constitute a "sale or exchange" necessary for capital gain treatment, taxpayer could receive capital gain treatment for the payments on the note only if that note qualified under section 1232. Under this theory, the Court must apply the harsh rule of section 1232 which denies long-term capital gain treatment to this note because it does not meet the formal prerequisites of the statute.

## I

### Section 1235 Argument

■ Section 1235 of the 1954 Code was enacted to insure that, in the case of an individual taxpayer, a transfer of all substantial rights in a patent would be considered a "sale or exchange", regardless of whether the consideration was payable during the transferee's use of the patent or was contingent upon the commercial exploitation of the patent. Section 1235, however, limits this remedial treatment to only those taxpayers who meet the section 1235(b) statutory definition of "holder". Section 1235(b) defines a "holder" as being either "any individual whose efforts created such property," section 1235(b)(1), or any other individual "who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention . . . ," section 1235(b)(2).[14]

Taxpayer urges that the Tax Court was clearly erroneous in finding that he was not a Section 1235 holder of the new inventions prior to their reduction to practice. The Tax Court held:

"It was incumbent upon petitioner to show that there had been an equitable assignment to him of the new Napier inventions prior to July 1944, the date these inventions were actually reduced to practice. Even if we were to infer that there was some sort of assignment of these inventions to petitioner prior to August 11, 1944, the date on which Napier assigned to the Den-Nap partnership 'all of his existing inventions and applications for patents relative to the manufacture and use of electric molds in the recapping of tires, subject to such licenses and assignments as are now outstanding,' such an inference would not place the assignment prior to the date of 'actual reduction to practice' of the inventions."

57 T.C. at 366. Taxpayer asserts that he qualifies as a holder both under section 1235(b)(1) and section 1235(b)(2).

Taxpayer's first factual contention is that the exercise of the January 31, 1944 option gave him ownership of the improved inventions that were then contemplated in connection with the original inventions, to which the January 31, 1944 option agreement directly referred. P & D Sales & Mfg. Co. v. Winter, 7 Cir. 1964, 334 F.2d 830. Our independent analysis of the record supplied us by taxpayer does not in any way convince us that the Tax Court was clearly erroneous in its holding (1) that the January 31, 1944 agreement covered only the original inventions, and (2) that taxpay-

14. The Senate Finance Committee explained section 1235 insofar as it is here pertinent:

The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a "sale or exchange" under existing law, with the exception noted relating to contingent payments, which exception is justified in the patent area for "holders" as herein defined. S.Rep. No. 1622, 83d Cong., 2d Sess., p. 439; 3 U.S.Code Cong. & Admin.News (1954) pp. 4621, 5082–5083.

er had failed to prove any equitable or actual assignment of the improved inventions other than Napier's August 11, 1944 assignment to Den-Nap, which occurred after the improved inventions were reduced to practice in July of 1944. The very fact that taxpayer entered into an assignment agreement with Napier on August 11, 1944 shows that even in taxpayer's mind the assignment of the original inventions did not include the improved invention and that he therefore had not acquired an interest in the improved inventions prior to their reduction to practice.

Taxpayer alleges as an alternative factual argument that he was a joint inventor of the improved inventions within the meaning of section 35 U.S.C. § 16. Taxpayer asserts that both his unrebutted testimony and the Tax Court findings show that he made a substantial contribution to the inventive thought and final result of the improved inventions. However, taxpayer also asserted in his petition before the Tax Court that:

The facts upon which petitioners rely as the basis of this case are as follows:

(a) James W. Napier was the inventor in an Application for Letters Patent, serial number 586,684 relating to tire recapping apparatus, such application having been filed April 15, 1945 and continued as application serial number 789,989 filed December 5, 1947; and the inventor of a separate section abutment ring mold component for tire recapping apparatus described in Application for Letters Patent, serial number 552,909.

The inventions described in this statement are the new inventions that taxpayer now claims he jointly invented. The Commissioner has informed us that taxpayer did not contend that he was a joint inventor in the Tax Court, and the Tax Court made no finding of fact concerning this issue.

■ It is the general rule that appellate courts should not consider a factual point not raised or decided by the Tax Court. Helvering v. Cement Investors, Inc., 1942, 316 U.S. 527, 62 S.Ct. 1125, 88 L.Ed. 1649; General Utilities & Operating Co. v. Helvering, 1935, 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154; Helvering v. Savage, 1936, 297 U.S. 106, 56 S. Ct. 375, 80 L.Ed. 511; Pokress v. C.I.R., 5 Cir. 1956, 234 F.2d 146; cf. Estate of Byrd v. C.I.R., 5 Cir. 1967, 388 F.2d 223. The reason for this rule is that appellate courts do not have the original jurisdiction necessary to review factual arguments that were not raised in the tribunal below. If taxpayer wished the Tax Court to find him a joint inventor, he should have urged this factual theory upon the Tax Court in order that it might make the necessary finding of fact concerning this contention, Pokress v. C.I.R., *supra.*

We are certain that taxpayer's highly competent counsel would have provided us with material to refute the Commissioner's contention that this factual issue was not argued below if such material exists. We are equally certain that the learned Court below would have ruled on such a pertinent factual issue had it been presented. Furthermore if, as the taxpayer argues, there is any holding concerning this issue *implicit* in the Tax Court's opinion, it is that taxpayer was not a joint inventor. If the Tax Court considered this issue, its failure to rule affirmatively on it implicitly denies the taxpayer's contention. Finally, in the light of taxpayer's own assertion that Napier was the inventor of the improved inventions, we would not consider an explicit finding that taxpayer was not a joint inventor clearly erroneous. Being cognizant of all of these factors, we conclude that this factual issue is not appropriately before us on review.

We hold that the Tax Court was not clearly erroneous in finding that taxpayer does not qualify as a holder under section 1235. We therefore find it nei-

ther necessary, nor judicially appropriate, to pass on his argument concerning the applicability of section 1235 to a section 351 transaction.

## II

### Section 453 Argument

Under Section 1222 of the 1954 Code capital gain treatment is available only to gains realized upon the "sale or exchange" of property. Dobson v. C.I.R., 1944, 321 U.S. 231, 64 S.Ct. 495, 88 L.Ed. 691. Although Congress has not defined "sale or exchange," the Supreme Court has held that the terms should be given their ordinary meaning. C.I.R. v. Brown, 1965, 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75; Helvering v. William Flaccus Oak Leather Co., 1941, 313 U.S. 247, 249, 61 S.Ct. 878, 880, 85 L.Ed. 1310, 1312. In compliance with this mandate, the courts have consistently held that a collection on a note is not a "sale or exchange" as required by Section 1222 and accordingly have denied capital gain treatment to the proceeds of such a collection unless a statutory provision grants "sale or exchange" status to the transaction. Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L. Ed. 855; Pounds v. United States, 5 Cir. 1967, 372 F.2d 342, 349; Riddell v. Scales, 9 Cir. 1969, 406 F.2d 210, 212.

■ The court below concluded that the only statutory provision that might conceivably grant sale or exchange status to the payments taxpayer received on the note was section 1232,[15] which provides "exchange" status to amounts received upon retirement of certain forms of corporate or governmental indebtedness. However, it is patent that the payments received in collection of taxpayer's note do not qualify for treatment under section 1232 because the note was not issued in registered form or with interest coupons attached as section 1232 required of notes issued prior to January 1, 1955. Thus, the Tax Court properly concluded that the payments taxpayer received do not qualify for captal gain treatment under section 1232, and therefore that the gain received in retirement of the note is ordinary income.

■ Taxpayer urges that the note he received from Precision is not of the type contemplated by section 1232 because it had no "independent significance," Estate of William F. Stahl, 1969, 52 T.C. 591, 598, aff'd on this point, 7 Cir. 1971, 442 F.2d 324, but rather was solely an evidence of the indebtedness of Precision to pay a prescribed installment purchase price for the patent rights. Taxpayer urges that the payments he received thus qualify for long-term capital gain treatment pursuant to the installment sale provisions of Section 453(d).[16]

We reject taxpayer's argument. Both the Tax Court and this Court have found that the note was a security received in a tax free exchange.[17] We now need only repeat what we said in United States v. Hertwig: " . . . Dennis and Mattox, as holders of the notes, had a continuing proprietary interest in the success of the venture," 398 F.2d at 455. This statement amply supports the finding that the note had "independent significance" apart from its character as an evidence of indebtedness. For the reasons stated in United States v. Hertwig, *supra*, we again find that the note was a security representing a continuity of interest by the recipient in the corporate business. *See* Baker Commodities Inc., 1967, 48 T.C. 374, aff'd on other grounds, 9 Cir. 1969, 415 F.2d 519, cert denied, 1970, 397 U.S. 988, 90 S.Ct. 1117, 25 L.Ed.2d 395. The note is thus precisely the type of corporate indebtedness encompassed by section 1232, and therefore it must meet the formal prerequisites of section 1232 before it can qualify for capital gain treatment.

Furthermore, for taxpayer to argue that Section 453(d) is applicable to a

15. *See* note 10, *supra*.

16. *See* note 11, *supra*.

17. *See* note 9, *supra*.

transaction which has been adjudged a Section 112(b)(5) transaction (now Section 351 of the 1954 Code) is to ignore the clear import of that finding. To accept taxpayer's argument that the transaction was an installment sale in which he is empowered by section 453(d) to spread the tax payments over the period in which the sale proceeds are actually received would be to allow him to make the effective election with regard to the appropriate basis for the patents received by Precision. Section 362(a) [18] provides that the corporation's basis in assets received in a section 351 exchange is equal to the sum of the transferor-shareholder's basis in the property plus the amount of gain recognized by the transferor-shareholder. This Court has already held in *Hertwig* that the basis of the patents in the hands of Precision was limited to their value in taxpayer's hands at the time of the transfer, without allowing the addition of any gain recognized by taxpayer; to hold now that the payments received by taxpayer on the note only represent proportionate collections on a completed sale would give the transaction an improperly schizophrenic character. Under taxpayer's theory of the case *the patents* involved in this transaction *do not* receive as their basis an amount equal to their value in the hands of taxpayer at the time of transfer plus the amount of gain recognized by taxpayer on the transfer because there is no gain recognized by taxpayer, but *taxpayer does* treat the note as if he did realize gain at the time of the transfer of the patents.

Taxpayer cites this Court's holding in Campbell v. Carter Foundation Production Company, 5 Cir. 1963, 322 F.2d 827, in support of the proposition that the payments on a note can be treated as if in payment of an indebtedness, while the property transferred in exchange for the note is denied a stepped-up basis because the note is a security. *Campbell* is authority for that proposition, but in *Campbell* the Court specifically held that the corporation involved was not undercapitalized and that the notes could at all times have been paid by the corporation through outside financing, 322 F.2d at 832. The Courts considering the instant facts have made specific findings that taxpayer "assumed the economic risk in the new corporation by taking a note, payment of which was completely dependent on the success of the new business . . .," 57 T.C. at 362, and that Precision had a capital of only $10,000 to bear the burden of $3,000,000 in notes, 398 F.2d at 455. Clearly, the holding of *Campbell,* which this Court specifically limited to its facts in that case, 322 F.2d at 832, and which had nothing to do with the applicability of section 453 to a section 351 transaction, is inapplicable to the factual situation which we here review.

"The installment basis of reporting was enacted, as shown by its history, to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price. Another reason was the difficult and time-consuming effort of appraising the uncertain market value of installment obligations."

C.I.R. v. South Texas Lumber Co., 1948, 333 U.S. 496, 503, 68 S.Ct. 695, 700, 92 L.Ed. 831, 838. Where section 351 applies to make the sale or exchange transaction nonrecognized and nontaxable, taxpayer cannot seriously argue that he

---

18. § 362(a) *Property acquired by issuance of stock or as paid-in surplus.*—If property was acquired on or after June 22, 1954, by a corporation—

 (1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

 (2) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

is entitled to make the section 453 election as to *when* to be taxed on a nontaxable event.

■ Taxpayer wants the avails of a tax-free transaction to be deemed taxable transfers entitled to installment treatment. The whole philosophy of a tax-free exchange is that no tax event arises from that transaction, but rather that tax treatment awaits subsequent dispositions of the property and securities transferred in the exchange. For taxpayer to treat the amounts received in payment of the security as installment payments on a gain realized at the time of the transfer contradicts the tax-free status of that original transfer. Taxpayer would have us treat the payments on this note as installment payments arising from a taxable event, but the note was not received in a taxable event; it was received in a tax-free exchange and therefore payments on it are taxed in accordance with the tax treatment of the event in which they are received. If taxpayer sold this note, he might qualify for capital gain treatment, but since he collected payments on it, he can only qualify for capital gain treatment if the note meets the formal requirements of section 1232. It doesn't, so he doesn't.

We therefore hold that section 351 negates section 453 in that a section 351 transfer to a corporation controlled by transferor in exchange for stock or securities in that corporation does not qualify for treatment under section 453.

### III

#### The "Open Transaction" Argument

Taxpayer next argues that the note did not have any fair market value at the time of its receipt and that therefore the transaction was "open" for tax purposes. As an "open transaction," no gain was realized at the time of the sale, with the result that gain was realized and reportable only when payments were received on the note. He complains that the Tax Court neither made a contrary finding nor discussed the issue in its opinion. We find, however, that there was no need to address the point, for in holding that the transaction was a section 351 tax-free exchange and that the note was of the variety of corporate indebtedness envisioned by section 1232, the Tax Court refuted taxpayer's "open transaction" argument.

■ The "open transaction" doctrine is an exception to the usual treatment arising from an exchange of property for a note or other form of property. When a note is received in exchange for property, the fair market value of the note is usually ascertainable and the gain can be computed and taxed at that time, the taxpayer being deemed to have received the market value of the note. Cowden v. C.I.R., 5 Cir. 1961, 289 F.2d 20, 24. Thereafter, the note is seen as an independent asset with a new cost basis equal to the fair market value previously charged as income to the taxpayer. The original transaction is then deemed closed because the appropriate tax consequences have taken place.

■ However, when the note received in the exchange does not have a readily ascertainable fair market value at the time of its receipt, computation of gain on the exchange is impossible. As a result, the courts have found it necessary to treat the exchange as an "open transaction" until the note is collected. Upon collection the amount received relates back to the initial exchange for tax purposes. Burnet v. Logan, *supra;* C.I.R. v. Carter, 2 Cir. 1948, 170 F.2d 911; Westover v. Smith, 9 Cir. 1949, 173 F.2d 90. Thus, if the "open transaction" event qualified for capital gain treatment, the amounts ultimately collected do also.

■ The "open transaction" doctrine is a rule of fairness designed to ascertain with reasonable accuracy the amount of gain or loss realized upon an exchange, and, if appropriate, to defer recognition thereof until the correct amounts can be accurately determined. The doctrine was thus clearly not intended to be applied to an exchange under section 351, where the gain or loss is

not recognized, since there is no need to defer recognition of gain that is not recognized by operation of statute. There being no gain recognized at the time of the transfer, there is no gain to defer, and the "open transaction" doctrine is therefore inapplicable.

 Taxpayer urges that Section 351 mandates a nonrecognition of gain only in a closed transaction, where gain would be recognized except for the application of that section. But Section 351 operates automatically and mandatorily whenever its factual prerequisites are met. Since the statute itself creates no distinction between "open" and "closed" transactions, it is obvious that the question of whether or not the stock or securities received by the transferor have an ascertainable value in no way inhibits its operation. To follow taxpayer's lead and hold that the operation of section 351 hinges upon the answer to the question of whether the transaction is "open" or "closed" would be to provide a boon in the form of automatic capital gain treatment for section 351 notes having no ascertainable value, even though no such automatic treatment is available for section 351 transaction notes with ascertainable values. Taxpayer presents no support, either in law or in logic, for creating this arbitrary differentiation. It is not for this Court to engraft this ungainly appendage upon section 351. We therefore reject taxpayer's ingenious invitation to inequitable inconsistency by holding that the "open transaction" doctrine is inapplicable to a section 351 transfer.

Taxpayer's note is an animal in the Internal Revenue Code zoo, but *Hertwig* caged it in section 351 and not in an "open transaction." There are no interconnecting avenues of ingress or egress to facilitate the mating suggested by taxpayer. Section 351 cannot be bred with an "open transaction" to create the hybrid which taxpayer proposes. This hybridizing of the Code would sectionalize the transaction to fit taxpayer's particular tax theory at his particular chosen point of time. The Code may not be a paradigm of coherence, but it has far too much basic consistency to permit this result. A section 351 security may be like a chameleon in that under certain conditions it can look like an evidence of an "open transaction," but it cannot be more than one thing at one time. If it could, the Internal Revenue Code would indeed be an endangered species.

## IV

### Conclusion

Taxpayer has woven together an intricate, involved, and novel legal argument. The argument must fail however, both because individual threads are weak, and because the fabric as a whole is defective. Taxpayer's theory fails because the fact findings of the Tax Court were not clearly erroneous, and because his legal arguments, although intriguing, are totally without legal merit when viewed in the context of the purpose and import of the Internal Revenue Code sections and the tax doctrines that he attempts to utilize.

One question governs the tax treatment of the payments received on the note: were they received in a taxable sale or exchange? Periodic payments on the note are not sales or exchanges. The actuating and generating parent which birthed the note was not a taxable sale or exchange, but was a section 351 tax-free transaction. *Hertwig* must rule this case not on the basis of res adjudicata, collateral estoppel, or the law of the case, but on pure precedent. Again confronted with the facts of *Hertwig,* precedent compels us to find again that the note was received in a tax-free transaction. Although our Internal Revenue Code is not free of incongruities, it does not foster or sanction a simultaneous right hand taxable sale or exchange with a left hand tax-free transaction. A section 351 transaction is not a non-taxable transaction for some purposes and a taxable transaction for others. The Jekyll of *Hertwig* cannot become the Hyde of *Dennis.*

In this tax conundrum taxpayer constructs an ingenious but solecistic argument. He seeks abode in various combinations of sections of the Code, but his structure founders because the superstructure of the Code clearly architected another design. Taxpayer builds to a capital gains structure, but as we engineer the transaction we find a house of ordinary income. Where the foundation is a note of 150 parts coming from a section 351 tax-free transaction, the note cannot be renovated by any codal carpentry into a section 453 transaction or into an "open transaction." Taxpayer has constructed perhaps a thing of beauty to behold, but his shining palace housing capital gains proves to be built upon foundations of sand. The note that emanated from *Hertwig* was a section 351 security. We are not at liberty to denominate it otherwise.

The Tax Court correctly held that the payments taxpayer received on the note were ordinary income in the year of receipt. Its judgment is affirmed.